**In re NASDAQ MARKET–MAKERS ANTITRUST LITIGATION.**

**M.D.L. No. 1023.
94 Civ. 3996 (RWS).**

United States District Court,
S.D. New York.

Nov. 26, 1996.

Fine Kaplan and Black, Philadelphia, PA (Arthur M. Kaplan, of counsel), Lovell & Skirnick, LLP., New York City (Christopher Lovell, Robert A. Skirnick, of counsel), Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA (Leonard B. Simon, of counsel), for Plaintiffs.

Shearman & Sterling, New York City (Joseph T. McLaughlin, James T. Halverson, Thomas F. Swift, Brian S. Chevlin, of counsel), Liaison Counsel for Defendants and Attorney for Defendant Herzog, Heine, Geduld, Inc.

## OPINION

SWEET, District Judge.

Plaintiffs in this multidistrict securities antitrust class action have moved for class certification pursuant to Rules 23(b)(2) and (3), Fed.R.Civ.P. and to compel discovery pursuant to Rule 37(a), Fed.R.Civ.P. For the reasons set forth below, Plaintiffs' motion will be granted in part.

### Parties

The parties and prior proceedings are fully set forth in several prior opinions of this court. *See In re Nasdaq Market–Makers Antitrust Litigation,* 894 F.Supp. 703 (S.D.N.Y.1995) ("*Nasdaq I*"); *In re NASDAQ Market–Makers Antitrust Litigation,* 164 F.R.D. 346 (S.D.N.Y.1996) ("*NASDAQ II*"); *In re NASDAQ Market–Makers Antitrust Litigation,* 1996 WL 187409 (S.D.N.Y. April 18, 1996) ("*NASDAQ III*"); *In re NASDAQ Market–Makers Antitrust Litigation,* 929 F.Supp. 723 (S.D.N.Y.1996) ("*NASDAQ IV*").

The 33 named Defendants (the "Defendants" or "Market-makers") in this action are all market-makers on the Nasdaq exchange.[1] The Complaint in this action describes them as "leading Nasdaq market-makers." ° Nas-

---

1. The named Defendants include: Goldman Sachs & Co.; Herzog, Heine, Geduld, Inc.; Alex. Brown & Sons, Inc.; Cantor Fitzgerald & Co.; CS First Boston Corp.; Donaldson, Lufkin & Jenrette, Inc.; Bear, Stearns, Inc.; Cowen & Co.; Dean Witter Reynolds Inc.; Hambrecht & Quist, Inc.; Jeffries and Co., Inc.; Kidder, Peabody & Co. Incorporated; Lehman Brothers, Inc.; Kemper Securities Group, Inc.; Legg Mason Wood Walker, Inc.; Mayer & Schweitzer, Inc., Merrill Lynch & Co.; Morgan Stanley & Co.; Olde Discount Corporation; Paine Webber Inc.; Montgomery Securities; Nash, Weiss & Co.; Oppenheimer & Co., Inc.; Piper Jaffray & Hopwood, Inc.; Prudential Securities Incorporated; The Robinson–Humphrey Company, Inc.; Sherwood Securities Corp.; Troster Singer; Robertson, Stephens & Company; Salomon Brothers Inc; Smith Barney Inc.; UBS Securities Inc.; Weeden & Co., L.P.

daq is a computerized securities quotations system operated by the National Association of Securities Dealers ("NASD"). In 1993, Nasdaq trading volume totaled more than 66.5 billion shares, with an average of 263 million shares traded each trading day. For that year, more than $1.35 trillion dollars in trades were executed through Nasdaq. *1994 Nasdaq Fact Book and Company Directory ("Fact Book")*. In 1993, there were 492 Nasdaq market-makers, making markets in 5,393 stocks, of which approximately 3,250 are listed and traded on the Nasdaq National Market, and the remainder on the Nasdaq Small Cap Market. On average there are 11 market-makers for each Nasdaq stock, although there are some stocks with more than 40 market-makers.

Plaintiffs include the State of Louisiana, through its Attorney General, Richard P. Ieyoub, which brings this action in its capacity as *parens patriae*, trustee, guardian, and representative of Louisiana investors allegedly damaged by Defendants' price-fixing scheme, and 30 individual plaintiffs [2] who purchased or sold shares of Class Securities from one or more Defendants or their commonly owned affiliates during the period of May 1, 1989 to May 24, 1994.

### Prior Proceedings

The first class-action complaint in what is now a multidistrict case was filed in this Court on May 27, 1994 following reports in the media on May 26 and 27, 1994 of a study by Professors William G. Christie and Paul H. Schultz [3] discussing the spreads on the Nasdaq exchange (the "Christie & Schultz study"). Eventually more than two dozen complaints were filed around the country, alleging variations on the theme that Nasdaq Market-makers had engaged in a conspiracy to avoid odd-eighth quotes in violation of the Sherman Act, 15 U.S.C. § 1. Approximately two dozen of the thirty-three moving Defendants were defendants in at least one of these initial complaints.

Certain parties named in the initial complaints petitioned the Judicial Panel on Multidistrict Litigation (the "Panel") for consolidation of all related actions before this Court. On October 14, 1994, the Panel ordered that the already filed actions, as well as later-filed actions, be assigned to this Court.

A pretrial order was signed on November 16, 1994 which named Plaintiffs' Co–Lead Counsel and directed Defendants to choose liaison counsel. The Court confirmed Defendants' choice on December 21, 1994.

Plaintiffs filed a "Consolidated Amended Complaint" on December 16, 1994. By Opinion dated August 3, 1995, this Court granted Defendants' motion to dismiss that complaint based on Plaintiffs' failure to identify the securities that are the subject of this action, and granted Plaintiffs leave to replead within 45 days. *See Nasdaq I.*

On August 22, 1995, Plaintiffs filed a Refiled Consolidated Complaint (the "Complaint"), identifying 1659 Nasdaq traded securities as the securities at issue in this action.

On December 6, 1995, Plaintiffs moved for an order, pursuant to Federal Rule of

---

**2.** Individual named plaintiffs include: Donald Bleznak c/f Andrew Bleznak, a resident of New Jersey; Richard I. Burstein, a resident of Vermont; Chevra Gemilath Chasodam, a charitable organization located in New York; Carl S. Clark and Patricia Clark, residents of Michigan; Daniel D'Addario, a resident of New York; Roseann D'Addario, a resident of New York; Maxine Dampf, a resident of New York; Jerome D. Derdel, M.D., a resident of Pennsylvania; Sulochana Desai, a resident of Michigan; H. Leslie Fineberg, a resident of New Jersey; Nicholas Frangiosa, a resident of Pennsylvania; Neal Hansen and Donna Hansen, residents of New Jersey; Timothy Hennessey, a resident of Oregon; Brent Johnson, a resident of Minnesota; Charles Kaye, a resident of Michigan; James Krum, a resident of Minnesota; Robert Lipinski, a resident of New Jersey; Dr. John Lorge, a resident of the State of Washington; William Lutz, Jr., a resident of Pennsylvania; Dennis Maloney, a resident of New York; Kevin Maloney, a resident of New York; Richard I. Perlman, a resident of California; Jeffrey Sachs, a resident of California; David Siegel, a resident of California; Two Guys Limited Partnership and their General Partner, Geltmore, Inc., having their principal place of business in New Mexico; Peter Wasserman, a resident of the State of New Hampshire; Dennis Weiner, a resident of New Jersey; and Sumner Woodrow, a resident of Massachusetts.

**3.** The article, entitled "Why do NASDAQ Market Makers Avoid Odd–Eighth Quotes?," was published in *The Journal of Finance* in December, 1994.

Civil Procedure 37(a), to compel Defendants to produce, to the extent responsive to consolidated discovery requests, CID interrogatories, documents reflecting agreements modifying the CIDs, answers to the CID interrogatories, CID deposition transcripts, and CID financial discovery; and to modify the Stipulated Order Regarding Confidential Documents (the "Confidentiality Order") to permit Plaintiffs to confer with the DOJ regarding Defendants' compliance with Court orders regarding CID discovery.

Plaintiffs' motion was resolved pursuant to Joint Proposed Pretrial Order No. 3 (the "Pretrial Order"), prepared by the parties and ordered by this Court on March 7, 1996. The Pretrial Order read in part:

6. On February 28, 1996, each defendant will identify those of its current employees or former employees who were deposed by the DOJ in connection with the Nasdaq investigation, to the extent known to that defendant.

7. By March 7, 1996, each defendant shall produce copies of all materials, not previously produced pursuant to the Stipulated Order, that were given to the Department of Justice, Antitrust Division, pursuant to Civil Investigative Demands as described in the Stipulated Order, setting forth revenues, costs, profit and/or losses derived from trading Nasdaq securities.

. . . . .

10. By March 20, 1996, defendants shall produce copies of all interrogatory answers that were given to the Department of Justice, Antitrust Division, pursuant to Civil Investigative Demands as described in the Stipulated Order, to the extent such answers related to the operation and structure of the Nasdaq Stock Market. Defendants shall also produce the interrogatories to which answers are being produced pursuant to this paragraph.

The Pretrial Order also stayed discovery on the merits of this litigation pending resolution of Plaintiffs' as yet unfiled motion for class certification. *See* Pretrial Order, ¶ 24.

---

**4.** The background and proceedings of the Government Action are more fully set forth in the Related Proceedings section herein, and in the

Plaintiffs moved for class certification on March 20, 1996. By Opinion dated April 18, 1996, this Court granted in part Defendants' motion to depose certain proposed class representatives prior to submission of Defendants' opposition to the instant motion for class certification. Pursuant to that Opinion, Defendants were permitted to conduct depositions of the State of Louisiana. *See NASDAQ III.*

Oral argument on Plaintiffs' motion for class certification was heard on June 25, 1996. Additional submissions have been received until issuance of this Opinion.

On August 30, 1996, Plaintiffs moved (i) to lift the stay of discovery imposed by ¶ 24 of Pretrial Order No. 3, and (ii) to compel Defendants to produce the following documents related to a companion case filed by the Antitrust Division of the Department of Justice ("DOJ") (the "Government Action"): (a) all Civil Investigative Demand ("CID") deposition transcripts within defendants' control, and (b) a settlement memorandum created by the DOJ (the "Settlement Memorandum") and any evidentiary materials expressly referenced therein.[4] Oral argument on Plaintiffs' discovery motion was heard on October 16, 1996, at which time the motion was considered fully submitted.

As of November 1996, more than 30 actions had been consolidated in this Court as MDL 1023—*In re NASDAQ Market–Makers Antitrust Litigation.*

### Related Proceedings

In October 1994, the Antitrust Division of the Department of Justice ("DOJ") announced that it was commencing a broad review of a number of aspects of Nasdaq's market structure.

On November 14, 1994, the Securities and Exchange Commission (the "SEC") announced that it was undertaking a review of the operation of Nasdaq, including the "spreads" issue alleged in the Complaint, and broader issues concerning the structure of the market itself.

---

Opinion of the Court issued today in that action. *See United States v. Alex. Brown & Sons, Inc., et. al.,* 96 Cv. 5313 (S.D.N.Y. Nov. 27, 1996).

In addition, on November 20, 1994, the NASD announced the formation of a seven-member panel to undertake a "plenary review [o]f the effectiveness of the operation and surveillance" of the NASD.

On July 17, 1996, as a result of its investigation of Nasdaq's market structure, the Antitrust Division of the DOJ filed the Government Action, *United States v. Alex. Brown & Sons, Inc., et. al.,* 96 Cv. 5313, in this Court, alleging that twenty-three NASDAQ market-makers had engaged in price-fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[5] At least fifteen of the twenty-three Defendants in the Government Action are also Defendants in the consolidated class action. The Government Action was assigned to this Court as a related action to the instant class action.

The Government Action was based on evidence gathered by the DOJ during the course of its investigation. According to the Competitive Impact Statement filed by the DOJ pursuant to Section 2(b) of the APPA, 15 U.S.C. § 16(b)–(h), which summarizes the evidence supporting the Complaint's allegations, the Antitrust Division took over 225 depositions. Defendants have previously identified 62 of their current or former employees whose depositions were taken by the DOJ. In connection with its investigation, the DOJ prepared the Settlement Memorandum, a compilation of evidence which was reviewed by Defendants.

Simultaneously with its Complaint in the Government Action, the Government filed a proposed Stipulation and Order, signed by each party, which, upon approval of the Court, will resolve the allegations of the Complaint in that action. Entry of the proposed Stipulation and Order is subject to the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), which requires a sixty-day period in which the public may submit comments relating to the Order.

On August 28, 1996, Plaintiffs in this class action moved to intervene in the Government Action in order to obtain discovery of the Settlement Memorandum and the underlying documents. Plaintiffs' motion to intervene and for discovery is resolved by an Opinion of this Court issued today in the Government Action.

*Facts*

■ For purposes of deciding a Rule 23 motion for class certification, the allegations set forth in the complaint are accepted as true. *See Shelter Realty Corp. v. Allied Maintenance Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978). The facts presented herein are taken from the Complaint and are limited to this motion.

Nasdaq is a computerized stock quotations system operated by the NASD and is one of the world's largest securities markets. Complaint ¶¶ 2, 99. In contrast to the stock exchanges, which employ an auction system (in which customer orders to buy or sell are matched against one another by a single "specialist" for the security), Nasdaq employs a multiple market-maker system in which customers sell to and buy from market-makers. Complaint ¶¶ 3, 100. Defendants are leading Nasdaq market-makers. Complaint ¶¶ 2(b), 99(a).

Nasdaq operates on a "bid and asked" system. The "bid" price is the price at which a given market-maker is willing to buy a security. The "ask" price is the price at which a market-maker is willing to sell the security. Complaint ¶¶ 2(c), 99(b), 100. Each Nasdaq market-maker is purportedly independent, and purportedly competes against other market-makers in quoting bids and asks for customer trades. Complaint ¶¶ 3, 100(b). All Nasdaq market-makers, including Defendants, continuously communicate to one another their bid and ask quotations through Nasdaq's "electronic billboard" computer system and computer screens in their respective offices. By virtue of such communication, each market-maker is continuously aware of the price quotations of every other market-maker. Complaint ¶¶ 4, 101.

A major source of every market-maker's profits—and a significant element of Plaintiffs' cost in executing trades over the Nasdaq system—is the difference between the bid price and the ask price for a given security. Complaint ¶¶ 3(c), (d), 99(b), (c). This

---

5. *See United States v. Alex. Brown & Sons, Inc., et al.,* 96 Civ. 5313 (S.D.N.Y. Nov. 26, 1996).

difference is referred to as the bid/ask spread, or simply the "spread." *Id.* The wider the spreads, the greater the market-makers' individual and collective revenues and profits. *Id.*

In a competitive market for most actively traded stocks, the spread in the stock will typically be one eighth of a point, or $0.125, *i.e.*, the bid will be 20⅛ and the ask will be 20¼. Complaint ¶¶ 6, 7, 105(a). On stock exchanges generally, including the New York Stock Exchange and the American Stock Exchange, spreads of one eighth are typical for most actively traded stocks. Complaint ¶ 105(b).

Nasdaq itself has claimed that multiple market-makers competing for business on Nasdaq securities and Nasdaq's high degree of automation should result in vigorous competition between market-makers to narrow spreads. Complaint ¶¶ 5, 103. However, Plaintiffs allege that beginning at least as early as May 1989, Defendants and their co-conspirators conspired to raise, fix and maintain at supra-competitive levels the "spread" paid by Plaintiffs and members of the proposed Class to trade in Class Securities. Complaint ¶¶ 1, 102, 103.[6]

As a result, spreads on Class Securities have been, on average, approximately twice as large as spreads on the New York and American stock exchanges for securities with comparable characteristics. Complaint ¶¶ 5, 11, 103. Moreover, from May 1, 1989 to May 1993, average spreads on the Nasdaq National Market increased by over 37%, while average spreads on the New York and the American stock exchanges held steady. Complaint ¶¶ 11, 110. Spreads were reduced by more than 50% on average when the very same securities moved from trading on Nasdaq to trading on an exchange. *Id.*

Defendants are alleged to have used a number of mechanisms to effect and police their conspiracy to fix spreads. Notably, Defendants and their co-conspirators collec-

tively refused to quote odd-eighths (*i.e.*, ⅛, ⅜, ⅝ and ⅞ of a dollar) in their bids and asks for Class Securities, thereby inflating their spreads. Complaint ¶¶ 7, 106(a).

In the absence of collusion, odd-eighth bids or asks would be expected to occur nearly as often as even-eighth bids or asks for any given security. However, Defendants quoted bids and asks for Class Securities in a manner that reflects a statistically unexplainable, almost complete absence of bids or asks in odd-eighths. Complaint ¶¶ 12, 105(c), 111. Accordingly, $.25 per share became the minimum spread for Class Securities, whereas the typical spread for actively traded Class Securities otherwise would have been half that amount. Complaint ¶¶ 7, 106(b).

Defendants are also alleged to have effected their conspiracy by following the spread set by the dominant dealer (known as "the name") in a particular security, and by agreeing not to compete by "breaking the spread"—that is, by quoting any odd-eighth or better bid or ask which would reduce Defendants' inflated spread. Complaint ¶¶ 10, 109. Any trader who attempted to break the spread was subject to various kinds of pressure and sanctions. Complaint ¶¶ 8–10, 107–109. For example, one trader who tried on occasion to narrow a spread told *Forbes* Magazine: "I used to get phone calls from people; they'd scream, 'Don't break the spread! You're ruining it for everybody else!'" Complaint ¶ 108. Another trader who tried something similar said: "My phone lights up like a Christmas tree. 'Whaddya doing in the stock? You're closing the spread. We don't play ball that way. Go back where you belong.'" *Id.* In addition to exhortations to rejoin the conspiracy, Defendants and their co-conspirators are alleged to have refused to conduct business in other contexts with any trader who tried to break a spread. Complaint ¶¶ 10, 109.

---

**6.** The spread in effect is a charge paid by plaintiffs and Class members to the market-makers for their services in making a market in these securities. Complaint ¶ 122. (The market-maker's charge per share for a buy or sell respectively is measured by the effective half-spread.) Defendants are alleged to have overcharged plaintiffs and other Class members by inflating that charge. *Id.* The extent of the overcharge is the difference between the spreads charged and the spreads that would have prevailed in a competitive market, absent violations of the antitrust laws. *E.g., New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1077 (2d Cir.1988).

In May 1994, Professors William G. Christie and Paul H. Schultz completed a study indicating the existence of collusion in the fixing of Nasdaq spreads.[7] Drafts of the Christie & Schultz study were circulated to the NASD, and the study was widely reported in the national press in late May 1994, along with criticism of Defendants' apparently collusive behavior. Complaint ¶ 112.

In late May 1994, immediately after the publicity about collusion, and in order to deflect such criticism, Defendants allegedly reintroduced odd-eighth quotations for certain high-profile Nasdaq securities, thereby cutting the spreads on those securities by approximately 50%. Complaint ¶¶ 13, 112. According to Plaintiffs, there were no significant changes in the structure of the market or the costs or risks of doing business that can account for this reintroduction of odd-eighths and dramatic reduction in the size of spreads. Complaint ¶¶ 14, 113.

Plaintiffs allege that the sole reason for Defendants' ability to cut the spreads for selected high-profile Class Securities by approximately 50% is that those spreads previously had been fixed and maintained at artificially inflated and supra-competitive levels. Complaint ¶¶ 14, 113. Plaintiffs allege that despite Defendants' effort to deflect criticism by cutting the spreads on selected high-profile Class Securities, Defendants' spread-fixing conspiracy has continued. Complaint ¶ 117.[8]

Plaintiffs allege that, as a result of Defendants' conspiracy, spreads on Class Securities were maintained at supra-competitive levels, and price competition among Defendants and their co-conspirators was restrained or eliminated. Complaint ¶ 120. Consequently, the prices which Plaintiffs and the members of the Class paid for purchases of Class Securities were artificially inflated, and the prices received from sales of Class Securities were artificially depressed. Complaint ¶¶ 120, 121.

## Discussion

The Plaintiffs seek an order pursuant to Rule 23, Fed.R.Civ.P., certifying this action as a class action on their own behalf and as representatives of the class defined herein.

The persons injured by Defendants' alleged conspiracy are those who traded in "Class Securities," which are defined by Plaintiffs as:

> any and all stocks traded on the Nasdaq National Market for which odd-eighth quotations were effectively eliminated for a period of at least one continuous, full year within the relevant time period. A security is a Class Security only for those periods during which odd-eighth quotations were effectively eliminated.

Complaint ¶ 82. Plaintiffs have identified 1,659 stocks which fit this definition of a Class Security.[9]

Plaintiffs seek certification of:

(a) a Class consisting of all persons, firms, corporations, and other entities (excluding Defendants and other Nasdaq market-makers, and their respective affiliates) who purchased or sold Class

---

7. The Christie and Schultz study, "Why Do NASDAQ Market Makers Avoid Odd Eighth Quotes?," was published in *The Journal of Finance* in December, 1994. At the American Finance Association's annual meeting on January 6, 1996, this study was awarded the Smith Breeden award, as best paper published in *The Journal of Finance* (the official journal of the American Finance Association) for the year.

8. For example, after Domestic Securities Inc. broke the spread on Intel Corp. on a trading day in late summer 1994, defendant Weeden & Co. flashed a message of "pathetic" on the trading terminal of Domestic Securities Inc. and defendant Morgan Stanley & Co. called immediately and complained "did you guys break the spread for 1,000 shares?" Complaint ¶ 108.

Similarly, after Domestic Securities Inc. broke the spread for Chiron Corp. stock, Keith Balter, the head of over-the-counter trading for defendant Weeden & Co., immediately telephoned Domestic Securities Inc. and stated "you're embarrassing and pathetic ... you're breaking the spreads for everybody." *Id.*

On July 15, 1994, Domestic Securities Inc. broke the spread in Xilinx Corp. stock, and, in response, defendant Hambrecht & Quist called Domestic and stated "This is bull ___. I have institutional customers come to me and I have to meet your price. It's bull ___, you guys going down 1/8 for 1,000 shares." *Id.*

9. A list of these stocks, reflecting the respective dates within the Class Period for which each stock is a Class Security, is attached as Exhibit "A" to the Complaint.

Securities on the Nasdaq National Market, trading directly (or through agents) with the Defendants or their co-conspirators, or with their respective affiliates, during the period May 1, 1989 to May 27, 1994 ("Class Period"); and

(b) a Subclass consisting of those members of the above Class who at the time of class notice are current brokerage customers of Defendants (or their affiliates), or whose brokerage accounts are cleared by the Defendants (or their affiliates), and to whom Defendants (or their affiliates) send periodic mailings.[10]

For purposes of this Class Definition, the term "affiliates" includes parents, subsidiaries and other commonly-owned affiliates.

### I. *Applying Rule 23*

Rule 23(c)(1), Fed.R.Civ.P., provides that "[a]s soon as practicable after the commencement of an action brought as a class action, the Court shall determine by order whether it is to be so maintained."

In applying this Rule, courts have held that class action determinations are to be based solely on the allegations set forth in the complaint, which are accepted as true, *see Shelter Realty Corp. v. Allied Maintenance Corp.*, 574 F.2d 656, 661 n. 15 (2d Cir.1978), and not on an inquiry into the merits of the plaintiff's claims. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974); *Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 94 (S.D.N.Y.1981). Thus, the only question to be determined at this stage is whether the requirements of Rule 23 have been satisfied. In making this determination, any references to the Plaintiffs' factual allegations set forth below are not to be construed as findings of fact regarding those allegations.

■ Furthermore, the Second Circuit has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation, *see Korn v. Franchard Corp.*, 456 F.2d 1206, 1208–09 (2d Cir.1972); *Green*

*v. Wolf Corp.*, 406 F.2d 291, 298, 301 (2d Cir.1968).

However, despite the liberal interpretation that this Court must give to Rule 23, it may certify this as a class action only after undertaking "rigorous analysis" to assure that the requirements of the Rule are satisfied. *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372–73, 72 L.Ed.2d 740 (1982).

Before addressing the specific requirements of Rule 23, the Court must address the standing issues raised by Defendants.

### II. *Standing*

■ It is well-established that "the burden is on the party claiming jurisdiction to demonstrate that the court has jurisdiction over the subject matter." *International Shipping Co., S.A. v. Hydra Offshore, Inc.*, 675 F.Supp. 146, 151 & n. 5 (S.D.N.Y.1987), *aff'd*, 875 F.2d 388 (2d Cir.1989). Standing is an essential element of subject matter jurisdiction, and the question presented is whether this action should be dismissed against any of these Defendants for lack of subject matter jurisdiction because Plaintiffs do not have standing to bring it.

The fundamental principles governing whether a plaintiff has standing to maintain an action in federal court are straightforward and familiar. A plaintiff must "allege[ ] such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial power on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (internal quotation omitted).

■ As this Court has noted, a plaintiff may not use the procedural device of a class action to bootstrap himself into standing he lacks under the express terms of the substantive law. *Angel Music, Inc. v. ABC Sports, Inc.*, 112 F.R.D. 70, 74 (S.D.N.Y. 1986). It must be noted that the question of standing is totally separate and distinct from the question of plaintiff's right to represent a purported class under Rule 23. Standing to

---

**10.** The proposed Subclass is limited to persons to whom the Defendants send periodic mailings.

sue is an essential threshold which must be crossed before any determination as to class representation under Rule 23 can be made. *Vulcan Society of Westchester County v. Fire Dep't of City of White Plains*, 82 F.R.D. 379, 398 (S.D.N.Y.1979); *German v. Federal Home Mortgage Corp.*, 885 F.Supp. 537, 547–48 (S.D.N.Y.1995).

### A. *Illinois Brick*

Defendants contend that under the Supreme Court's holding in *Illinois Brick*, which held that only direct purchasers from an alleged conspirator have standing to bring antitrust claims, proposed class members who traded through brokers not owned or controlled by Defendants are indirect purchasers, and therefore lack standing to sue Defendants.[11] *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 735, 97 S.Ct. 2061, 2069, 52 L.Ed.2d 707 (1977). As set forth above, the issue of *Illinois Brick* standing must be addressed at this juncture, prior to class certification.

■ The Supreme Court has strictly adhered to the bright-line rule established in *Illinois Brick*, holding that the "possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule." *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 216, 110 S.Ct. 2807, 2817, 111 L.Ed.2d 169 (1990). Nonetheless, where a particular industry structure includes a principal-agent relationship between the indirect and direct purchasers such that the two are not distinct economic entities in the purchase chain, the indirect purchaser has standing under *Illinois Brick*. *See Diskin v. Daily Racing Form, Inc.*, 1994–1 CCH Trade Cases ¶ 70,649, 1994 WL 330229 (S.D.N.Y. 1994).

■ Plaintiffs contend that proposed class members who purchased securities through non-Defendant owned brokers have standing under *Illinois Brick* because, as a matter of law, securities brokers are not distinct economic entities; rather, as statutorily defined, brokers buy or sell "for the account of oth-

ers," not for their own accounts. *See* 15 U.S.C. § 78c.

The small body of case law addressing this issue indicates that the question whether an investor who purchased Class Securities through non-Defendant-owned brokers has standing turns on the scope of the brokers' role in relation to the transaction at issue.

The plaintiff in *Diskin*, an antitrust suit against the publisher of the Daily Racing Form, a horse racing newspaper, asserted that *Illinois Brick* did not bar his suit because the distributors from whom he purchased the newspaper were mere sales agents who retained the right to send back all unsold copies to the publisher. The Court held that the distributors were "mere agen[ts]", and did "not constitute a distinct entrepreneurial link in the chain of distribution." *Diskin* at *5.

In *McCarthy v. Recordex Service, Inc.*, 80 F.3d 842 (3d Cir.1996) several individuals who had been plaintiffs in medical malpractice cases brought suit against copying services and hospitals that had charged $1 or more per page for copying. However, the hospital or copying service "in each case, billed the [plaintiff's] attorney directly." *Id.* at 845. Moreover, "in actual practice, the [law] firm never sought reimbursement for advanced costs where representation of the client did not lead to a recovery." *Id.* at 846. The Court found that, where "none of the plaintiffs retained their lawyers to act as mere purchasing agents," the lawyers themselves were "the direct purchasers of the hospital-record photocopies." *Id.* at 852.

The *McCarthy* court noted that, under the circumstances, the "plaintiffs here are no more direct purchasers of the hospital record photocopies than a passenger in a taxicab would be considered the direct purchaser of the gasoline used by the taxicab to carry the passenger to his destination." *McCarthy*, 80 F.3d at 853, n. 18.

This analogy clarifies the distinctions between the facts upon which the *McCarthy*

---

11. Defendants concede that investors who purchased securities through brokers who are commonly-owned affiliates of Defendants have standing under *Illinois Brick*. Accordingly, this section addresses only the standing of those investors who purchased securities through brokers not owned by Defendants.

holding was based and the facts present here. The brokers who purchased securities on behalf of investors did not incorporate those securities into a bundle of services that was then provided to the investors, in the way the photocopies were incorporated into legal services, or gasoline is incorporated into taxi service. Rather, the purchase of the securities was itself the ultimate service provided to the investor. Moreover, as securities brokers are in the business of effecting transactions "for the account of others," they do not constitute a distinct link in the chain of distribution.

Accordingly, the *McCarthy* court's holding—that an attorney's status as agent did not render her clients direct purchasers of photocopies—does not compel the conclusion that brokers' agent status does not render investors direct purchasers of stock such that they have standing under *Illinois Brick*. Stock brokers are not necessarily a separate "link in the chain of distribution," but instead (by statute) they trade "for the account of others."

This Court, in *Diskin*, has set forth several factors relevant to determining whether a principal and an agent constitute distinct economic entities for purposes of *Illinois Brick* standing:

> whether the agent performs a function on behalf of his principal other than securing an offer [or a price] from a buyer [or seller] for the ... product; the degree to which the agent is authorized to exercise his discretion concerning the price and terms under which the principal's product is to be sold [or bought]; and finally whether the use of the agent constitutes a separate step in the vertical distribution of the ... product.

*Diskin* at *5 (citing *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1031, n. 5 (2d Cir.1979)).

With respect to the first of these criteria, Defendants urge that some securities brokers provide investment advice as well as purchasing and sales services, and that they charge one lump sum to cover that advice as well as the sales. There has been no evidence submitted regarding which non-Defendant owned brokers provide such advice, and which only execute the purchases and sales requested by investors. Likewise, there is no evidence before the Court with respect to the broker's discretion concerning the price and terms of the purchase and sales. The third factor, whether the use of the broker constitutes a "separate step" in the vertical distribution of the securities, appears to be not an independent factor so much as the conclusion to which the first two factors lead.

In light of the cases cited above and the factors set forth in *Diskin*, the class will be defined to include investors who transacted through non-Defendant owned brokers where those brokers did not function as a distinct economic entity in the chain of purchase or sale. Thus, a determination of whether, in the event of a monetary settlement or judgment, particular investors who transacted through brokers are entitled to a portion of the award, will require evidentiary submissions in light of the *Diskin* factors.

In any event, even if it is later determined that some or all Plaintiffs who purchased or sold securities through a non-Defendant owned broker lack standing under *Illinois Brick*, those Plaintiffs will only be barred from prosecuting damage claims, and will still be entitled to remain in the class for purposes of seeking injunctive relief. *See McCarthy*, 80 F.3d at 856 (citing *Mid–West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 590 (3d Cir.1979); *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1167 (5th Cir.1979)).

### B. The State of Louisiana Cannot Sue on Claims of State Agencies

■ Plaintiff the State of Louisiana, through its Attorney General, Richard P. Ieyoub, seeks inclusion in the proposed class in its capacity as *parens patriae*, trustee, guardian, and representative of individual Louisiana residents. Plaintiffs have identified five retirement systems (the "Systems") on whose behalf the State of Louisiana now seeks to proceed as a class representative.[12]

---

12. The Systems are the Louisiana School Employees Retirement System, the Louisiana State Employees Retirement System, the Employees Retirement System of the Sewerage &

Complaint, ¶ 91. Plaintiffs contend that, pursuant to L.A.Rev.Stat. § 49:257A, the Attorney General has statutory authority to represent the systems, as they are state agencies.

L.A.Rev.Stat. § 49:257A provides:

.... [I]n addition, to any other powers, duties or authority granted to the attorney general and the Department of Justice by the constitution and the laws of the state, the attorney general shall represent the state and all departments and agencies of state government....

L.A.Rev.Stat. § 49:257A.

This statute, however, does not allow the Attorney General to act as a party in interest on behalf of state agencies; rather, it merely provides that the Attorney General may act as counsel for state agencies in certain cases. *See* Minutes of the House Committee on Appropriations, Regular Session, June 20, 1988 (legislative committee discussions focusing on litigation control issues, *i.e.*, numbers of attorneys to be retained, and method of selecting outside attorneys).

Louisiana's Supreme Court has long held that the State cannot sue on causes of action that belong to state agencies as distinct legal entities. The contrary view, advanced by the Attorney General here, was rejected by the Louisiana Supreme Court in *State v. Tensas Delta Land Co.*, 126 La. 59, 52 So. 216 (La. 1910):

The argument that the board is ... a mere instrumentality of the state, and that therefore the state may sue in every case where the said board might sue, contains a manifest non sequitur. Every city, town, and parish of the state is a mere agency or instrumentality of the state; but no one would venture to say that the Attorney General could ignore the existence of these

corporations and enforce, in the name of the state, any cause of action which any of them might have ... If one of these corporations have [sic] a right of action, the proper functionary to enforce same is the governing body of the corporation, and not the Attorney General, or the state. *Id.*, 52 So. at 221. *See also Saint v. Allen*, 172 La. 350, 134 So. 246, 249 (La.1931); *State, through Governor's Special Comm'n on Educ. Services v. Dear*, 532 So.2d 902 (La.App. 5th Cir.1988) (state agencies and political corporations are sole parties capable of bringing suit to enforce their rights); *State ex rel. Guste v. Board of Highways*, 275 So.2d 207 (La.App. 1st Cir.1973), *writ issued by*, 279 So.2d 201 (La.1973), *aff'd*, 289 So.2d 82 (La.1974).

Under Louisiana law, each of the Systems has the power to "sue and be sued," [13] demonstrating that each is a distinct legal entity from the State of Louisiana. *See Saint*, 134 So. at 249. Indeed, the retirement systems' legal independence from the State is demonstrated by the fact that the State has previously been sued by two of the Systems—the Louisiana State Employees' Retirement System and the Louisiana School Employees' Retirement System. *See Louisiana State Employees' Retirement Sys. v. State, Through Dept. of Justice*, 423 So.2d 73 (La. App. 1st Cir.1982), *writ denied*, 427 So.2d 1206 (La.1983).

There is thus a distinction between the State acting as plaintiff, and the Attorney General's statutory authority to represent state agencies proceeding in their own names. Even assuming the Attorney General is authorized here to serve as counsel to the Systems, such authorization does not transform the State into the real party in interest.[14]

Water Board of New Orleans, the Employees Retirement System of the City of Baton Rouge and the State of Louisiana District Attorneys' Retirement System.

**13.** *See* La.Rev.Stat.Ann. § 11:1001 *et seq.* (Louisiana School Employees' Retirement System); La.Rev.Stat.Ann. § 11:401 *et seq.* (Louisiana State Employees' Retirement System); La.Rev. Stat.Ann. § 11:1581 *et seq.* (Louisiana District Attorneys' Retirement System); La.Rev.Stat.Ann. § 11:3821 *et seq.* (Employees' Retirement Sys-

tem of the Sewerage & Water Board of New Orleans); *Board of Trustees of the Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge v. Commission on Ethics for Public Employees*, 655 So.2d 1355 (La.App. 1st Cir.1995) (Employees Retirement System at the City of Baton Rouge).

**14.** Even where the Attorney General has represented a state agency pursuant to La.Rev.Stat. Ann. § 49:257, the real party in interest remained the agency, not the State. *See, e.g.*,

Moreover, in the absence of a direct pecuniary interest, the state cannot proceed. *See Green v. Louisiana Underwriters Ins. Co.*, 571 So.2d 610, 615 (La.1990). Because the Systems' assets belong to state employees,[15] not to the State of Louisiana, Louisiana has no distinct pecuniary interest in the Systems' funds:

> The [retirement system] funds involved here consist of contributions made by the individual members of the retirement systems and matching contributions by the State. The State contributions are in the nature of fringe benefits or additional compensation. The funds here belong to the members of the systems. Neither the State nor the general public has any proprietary interest in same.

*Louisiana State Employees'. Retirement Sys.*, 423 So.2d at 75.

The claims for relief here thus belong to the individual retirement systems that bought or sold the securities. Those Systems alone have the right to assert their claims. *See Guste*, 275 So.2d at 207; *Tensas Delta Land Co.*, 52 So. at 216. Consequently, Louisiana has no viable claim to bring on its own behalf.

Plaintiffs also contend that the Systems may confer, and have conferred, authority upon the State to pursue its claims and upon the Attorney General "to represent" the systems. Although affidavits have been sworn on behalf of each of the Systems purporting to confer on the Attorney General authority to represent these systems in this case, this purported conferral of representational authority on the Attorney General does not establish the State as a party with claims to pursue, as required to proceed.

Finally, although Plaintiffs refer to the systems' purported willingness to intervene as plaintiffs, they have not done so, and their stated willingness to seek intervention in the future is not relevant to the instant motion.

### C. The Proposed Class Representatives Have Standing to Sue Each of the Named Defendants

■ Defendants note that 23 of the 33 named Defendants are not alleged to have traded with any of the named individual Plaintiffs. However, in order to establish standing against all the named Defendants, Plaintiffs need not have included among their proposed Class Representatives one individual who traded with each Defendant. Because antitrust liability is joint and several, a Plaintiff injured by one Defendant as a result of the conspiracy has standing to represent a class of individuals injured by any of the Defendant's co-conspirators. *Rios v. Marshall*, 100 F.R.D. 395, 404 (S.D.N.Y.1983).

## II. The Requirements of Rule 23(a)

Rule 23(a) provides that:

> [o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

If these four criteria are not met, an action may not be maintained as a class action. Fed.R.Civ.P.Rule 23(b). Each of these criteria is considered in turn below.

### A. Numerosity and Impracticability

■ Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Impracticability means difficulty or inconvenience of joinder; the rule does not require impossibility of joinder. *Northwestern National Bank of Minneapolis v. Fox & Co.*, 102 F.R.D. 507,

---

*American Furniture Co. v. International Accommodations Supply*, 721 F.2d 478 (5th Cir.1981) (Attorney General represented Louisiana State Employees' Retirement System in its own name).

**15.** The Attorney General has acknowledged that retirement system funds are not "public funds,"

but rather belong to the employee members of the systems, such that the State has no interest. Mr. Ieyoub admitted that the State has no interest in the monies owned by the Original and Late Filing Systems. Louisiana Attorney General Opinion No. 94–44.

511 (S.D.N.Y.1984); *Goldstein v. North Jersey Trust Company*, 39 F.R.D. 363, 367 (S.D.N.Y.1966). Here, the class numbers at least a million members, and the numerosity requirement is clearly satisfied. Moreover, a class of this size plainly makes joinder of all members impracticable, if not impossible.

Courts in this circuit have routinely held that classes far smaller than the one proposed here are sufficiently numerous for class certification. *See, e.g., Korn v. Franchard Corp.*, 456 F.2d 1206, 1209 (2d Cir.1972) (certifying class which may be limited to 70 investors); *McNeill v. New York City Housing Authority*, 719 F.Supp. 233, 252 (1989) (1,059 Section 8 tenants whose subsidies were suspended or terminated); *Fidelis Corp. v. Litton Industries, Inc.*, 293 F.Supp. 164, 170 (S.D.N.Y.1968) (certifying class of 35–70 individuals).

As this Court noted in *German*, 885 F.Supp. at 552, "[p]recise quantification of the class members is not necessary because the court may make common sense assumptions to support a finding of numerosity." *Accord, Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 55 (S.D.N.Y.1993); *Ellender v. Schweiker*, 550 F.Supp. 1348, 1359 (S.D.N.Y.1982), *app. dism'd*, 781 F.2d 314 (2d Cir.1986). Plaintiffs may rely on reasonable inferences drawn from the available facts in order to estimate the size of the class. *McNeill*, 719 F.Supp. at 252.

Here, as in *McNeill*, more precise information as to the numbers of persons affected is within Defendants' control, but "there is something within the record from which it can be inferred that a class does exist," and "a rough estimate could be made." *See Clarkson v. Coughlin*, 783 F.Supp. 789, 798 (S.D.N.Y.1992).

> In sum,

> there is no magic minimum number that breathes life into a class, *see Bruce v. Christian*, 113 F.R.D. 554, 556 (S.D.N.Y. 1986), and lack of knowledge of the exact number of persons affected is not a bar to certification where the Defendants alone have access to such data, *see McNeill v. New York City Housing Authority*, 719 F.Supp. 233, 252 (S.D.N.Y.1989); *Folsom v. Blum*, 87 F.R.D. 443, 445 (S.D.N.Y. 1980)....

*Clarkson*, 783 F.Supp. at 798.

The number of plaintiffs who have bought or sold Class Securities during the Class Period readily meets the numerosity requirement of Rule 23(a)(1).

### B. *Commonality*

Rule 23(a)(2) requires that, for an action to be properly maintained as a class action, there must be common issues of fact and law.

■ Here, common questions of law and fact exist as to whether a conspiracy existed among the Defendants to eliminate odd-eighths in order to inflate the spread artificially. Specifically, Plaintiffs assert that the following questions of law or fact are common to all plaintiffs in the proposed class:

(a) whether Defendants and their co-conspirators engaged in a conspiracy to raise, fix and maintain Nasdaq spreads at supra-competitive levels;

(b) the duration and extent of Defendants' conspiracy;

(c) whether each Defendants was a participant in the conspiracy;

(d) whether Defendants' conspiracy violated Section 1 of the Sherman Act;

(e) whether Defendants took affirmative steps to conceal their conspiracy;

(f) the effect of Defendants' conspiracy upon the Nasdaq spreads for Class Securities;

(g) the appropriate measure of damages and the amount of damages suffered by the Class as a whole;

(h) whether Plaintiffs and the members of the Class are entitled to declaratory and injunctive relief.

Complaint ¶ 88.

Numerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2). *See In Re Potash Antitrust Litigation*, 159 F.R.D. 682, 689 (D.Minn. 1995); *In Re Workers' Compensation*, 130 F.R.D. 99, 105 (D.Minn.1990) (recognizing

that "[a]ntitrust, price-fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy"); *Town of New Castle v. Yonkers Contracting Co., Inc.*, 131 F.R.D. 38, 41 n. 4 (S.D.N.Y.1990) ("We agree with plaintiffs that the issue of the existence and effect of an antitrust conspiracy involves common questions of law and fact."); *Thillens, Inc. v. Community Currency Exch. Assn.*, 97 F.R.D. 668, 677 (N.D.Ill.1983) ("The overriding common issue of law is to determine the existence of a conspiracy."); *In re Alcoholic Beverages Litigation*, 95 F.R.D. 321, 324 (E.D.N.Y.1982); *Jennings Oil Co., Inc. v. Mobil Oil Corp.*, 80 F.R.D. 124, 128 (S.D.N.Y.1978) (commonality requirement satisfied when plaintiff raises "common questions of the existence, scope, and effect of the alleged conspiracy"); *In re Master Key Antitrust Litigation*, 70 F.R.D. 23, 25–26 (D.Conn.), *app. dism'd*, 528 F.2d 5 (2d Cir. 1975); *Dennis v. Saks & Co.*, 1975–2 CCH Trade Cases ¶ 60,396, 1975 WL 909 (S.D.N.Y. 1975). *See also*, 4 H. Newberg & A. Conte, *Newberg on Class Actions* § 18.05 (3d ed.1992).

The Complaint alleges a single conspiracy among Defendants and their co-conspirators, as leading Nasdaq market-makers. Complaint ¶ 1, 2(b), 7–10, 99(b), 102, 104, 106–109. Proof of the alleged conspiracy is the heart of this case, and is crucial to the claims of all members of the class. Each of the putative class members has a common interest in proving the existence, scope, effectiveness and impact of that conspiracy, as well as the appropriate injunctive and monetary relief to remedy the injury caused by the conspiracy.

Even to the extent that "each member of the class presents a slightly different factual situation, each presents a common legal question." *Stenson v. Blum*, 476 F.Supp. 1331 1335 S.D.N.Y.1979) (citing *Lyons v. Weinberger*, 376 F.Supp. 248, 263 (S.D.N.Y. 1974); 3B *Moore's Federal Practice* ¶ 23.06–1 at 23–176, 23–180 (3d ed.1978)). In the event further proceedings reveal that some of the questions raised by the Plaintiffs require in-

dividual inquiries, those issues can be resolved either by further defining the scope of the class action, by designating sub-classes, or by decertifying the class. *See* Fed. R.Civ.P. 23(c)(4)(B).

In sum, there are sufficient common questions of fact and law to satisfy this requirement.[16]

## C. *Typicality*

Rule 23(a)(3) requires that the claims asserted by plaintiffs on behalf of a proposed class be typical of the claims of the other members of the class.

> Typicality refers to the nature of the claim of the class representatives and not to the specific facts from which the claim arose or relief is sought. The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.

*Dura–Bilt Corp.*, 89 F.R.D. at 99; *see Gary Plastic Packaging Corp. v. Merrill Lynch*, 903 F.2d 176, 179 (2d Cir.1990).

■ Typicality under Rule 23 requires that a class representative "have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *Daniels v. Amerco*, 1983–1 Trade Cas. ¶ 65,274, 1983 WL 1794 (S.D.N.Y.1983); *National Auto Brokers Corp. v. General Motors Corp.*, 60 F.R.D. 476, 486–87 (S.D.N.Y.1973) ("the primary criterion [for determining typicality] is the forthrightness and vigor with which the representative party can be expected to assert the interests of the members of the class").

■ The Plaintiffs in this action, like every other member of the proposed Class, are purchasers and sellers of Class Securities during the Class Period. They allege that they have been injured by Defendants' conspiratorial refusal to quote in odd-eighths, which artificially inflated the spread between

---

**16.** The issue of the predominance of common issues of law and fact is addressed herein at the Court's discussion of the requirements of Rule 23(b)(1).

the bid and the ask price, to the financial disadvantage of investors.

■ Rule 23(a)'s typicality requirement is established where, as here, the claims of the representative Plaintiffs arise from the same course of conduct that gives rise to the claims of the other Class members, where the claims are based on the same legal theory, and where the class members have allegedly been injured by the same course of conduct as that which allegedly injured the proposed representatives. *See, e.g., In re Drexel Burnham Lambert Group,* 960 F.2d 285, 291 (2d Cir.1992); *Rossini v. Ogilvy & Mather, Inc.,* 798 F.2d 590, 598 (2d Cir.1986); *German,* 885 F.Supp. at 554–55; *Maywalt,* 147 F.R.D. at 57; *Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. 193, 200 (S.D.N.Y.1992); *Dura–Bilt,* 89 F.R.D. at 99. *See also* 1 Newberg on Class Actions § 3.13 at 2–76 (the typicality requirement is usually met "when it is alleged that the same unlawful conduct was directed at or affected both the named plaintiffs and the class sought to be represented").

Defendants advance several contentions with respect to the typicality requirement of Rule 23(a). First, Defendants urge that typicality is defeated by objective economic variables which determine the spreads on a given security and which must be assessed individually to assess whether a given Class Security was actually affected by the alleged conspiracy. According to the Defendants, each Plaintiff has an interest only in demonstrating that the security which she bought or sold was affected by the alleged conspiracy at the time of the Plaintiff's transaction, and such a limited interest is insufficient to adequately represent the proposed class, which would include millions of investors with varying individual interests in demonstrating the effect of the alleged conspiracy on millions of different transactions over a five-year period.

■ Typicality, however, does not require that the situations of the named representatives and the class members be identical. *Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. at 200. *See also Dura–Bilt Corp.,* 89 F.R.D. at 99 n. 12. Moreover, provided that all claims arise from the same price-fixing conspiracy, factual differences among proposed Class members' claims do not defeat class certification.

As set forth above, the Court has determined that the alleged conspiracy will be susceptible by proof common to all class members. Moreover, the Court has also determined that a Plaintiff injured by one of the Defendants as a result of the conspiracy has standing to sue the co-conspirator defendants even though that plaintiff had no direct dealings with the co-conspirators. *See Rios,* 100 F.R.D. at 404. Accordingly, each Plaintiff has an incentive to demonstrate each Defendant's participation in the alleged conspiracy.

In *In re South Central States Bakery Products Antitrust Litigation,* 86 F.R.D. 407, 417 (M.D.La.1980), the court held:

[a]lthough ... members of the proposed class, bought through different mechanisms ... the essential claim of both [class representative] and the class members is that the prices paid were established by combination or conspiracy. The mere fact that all of the methods through which the alleged conspiracy was effected were not used with respect to [the plaintiff], or the fact that [the class representative] did not purchase from all defendants, does not determine that the claim of [the class representative] lacks typicality under Rule 23(a)(3).

86 F.R.D. at 417.

As held in the *In re Sugar Indus. Antitrust Litig.*:

In antitrust disputes, [s]ince the representative parties need prove a conspiracy, its effectuation, and damages therefrom—precisely what the absentees must prove to recover—the representative claims can hardly be considered atypical.

73 F.R.D. 322, 336 (E.D.Pa.1976). *See also,* 1 *Newberg on Class Actions* § 3.13 at 3–79 & n. 208 (explaining that "differences in the methods of purchase or kinds of products purchased among class members have been held not to bar a finding of typical claims" in price-fixing actions, and that "in class actions charging defendants with a conspiracy to fix prices, the claims of the named plaintiff were

held typical of the claims of the class members despite variations in the manner in which members of the class purchased from the defendants, variations in the kinds of products purchased, differences in price, and other factors"). In the present case, the typicality requirement is satisfied, because the Complaint alleges a single price-fixing conspiracy, and the class is limited to securities on which odd-eighth quotations were effectively eliminated by reason of that conspiracy.

Defendants also argue that institutional investors cannot be included in a class, because they are sophisticated traders with superior bargaining power who effectively determine, in individual negotiations, the prices at which they execute trades. In light of the Court's holding that the State of Louisiana may not proceed in this action on behalf of its state agencies, the named Plaintiffs do not currently include any institutional investors. Accordingly, the issue of the typicality of institutional investors' claims is not currently before the Court, and need not be addressed.

Finally, Defendants contend that the inclusion of six Plaintiffs who purchased or sold securities through a broker defeats typicality, as the claims of those Plaintiffs are factually and legally different from those of the remainder of the individual Plaintiffs, who traded directly with Defendants.[17] Defendants rely on *In re Anthracite Coal Antitrust Litig.*, 1978–1 Trade Cas. (CCH) ¶ 62,-059, at 74,590, 1978 WL 1341 (M.D.Pa.1978), in which the court held that the claim of the proposed class representative, a direct purchaser of coal, was not typical of a class where many of the class members purchased coal indirectly through middlemen. Here, however, the proposed class representatives include individuals who transacted directly with Defendants as well as those who used brokers to transact Defendants. According-

ly, the proposed Class representatives include those whose claims are typical of those proposed Class members who invested with a broker, as well as those who invested without a broker.

Defendants argue further that it has not been demonstrated that any of these six Plaintiffs' brokers actually traded directly with a Defendant or a co-conspirator, as required by Plaintiffs' class definition. In the event it is determined that any of those brokers did not trade with a Defendant or a co-conspirator, the investors on behalf of whom they traded will be deemed excluded from the class, as they will not meet the class definition.

### Adequacy of Representation

Rule 23(a)(4) requires that the class representatives be adequately representative of the class.[18] The Supreme Court has held that Plaintiffs must satisfy both prongs of a two-pronged test to qualify as adequate representatives: (1) the representatives' interests must not conflict with the class members' interests, and (2) the representatives and their attorney must be able to prosecute the action vigorously. *General Tel. Co.*, 457 U.S. at 157 & n. 13, 102 S.Ct. at 2370–71 & n. 13; *Dean v. Coughlin*, 107 F.R.D. 331, 334 (S.D.N.Y.1985). The commonality and typicality requirements blend together in determining whether the representative Plaintiffs' claims are typical enough of the classwide claims that the representatives will adequately represent the class. *General Tel. Co.*, 457 U.S. at 157 & n. 13, 102 S.Ct. at 2370–71 & n. 13.

The Plaintiffs thus must show, first, that there is an absence of conflict and antagonistic interests between the proposed representatives and the class members, and second, that Plaintiffs' counsel is "qualified, experienced and capable." *Ross v. A.H. Robins*

---

**17.** The issue of the *Illinois Brick* standing of those Plaintiffs who traded through non-defendant owned brokers is addressed *supra*, in the section of this Opinion addressing standing.

**18.** Plaintiffs propose the following 21 class representatives:

State of Louisiana, through its Attorney General Richard P. Ieyoub, Donald Bleznak c/f Andrew Bleznak, Richard I. Burstein, Carl S. and

Patricia Clark, Maxine Dampf, Jerome D. Derdel, M.D., H. Leslie Fineberg, Neal and Donna Hansen, Brent Johnson, Charles Kaye, James Krum, Robert Lipinski, John Lorge, Dennis Maloney, Kevin Maloney, Richard I. Perlman, Jeffrey Sachs, David Siegel, Two Guys Limited Partnership and its General Partner, Geltmore, Inc., Peter Wasserman and Dennis Weiner.

*Co.,* 100 F.R.D. 5, 7 (S.D.N.Y.1982); *accord In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992).

### 1. *Absence of Conflict*

 Defendants contend that inclusion in the Class of both purchasers and sellers creates an inherent conflict that precludes the named Plaintiffs from serving as class representatives. Plaintiffs' central allegation is that Defendants' conspiracy to eliminate odd-eighth quotes artificially widened spreads, such that a stock with an inside spread of ¼ should have been quoted with a spread of ⅛. Plaintiffs have not provided a mechanism for determining whether, in the absence of the conspiracy, the bid price on a given Class Security should have been ⅛ higher, or the ask price should have been ⅛ lower. According to Defendants, buyers of a given Class Security will want to show that the extra ⅛ inflated the ask—their purchase price—whereas sellers of that same Class Security would want to show that the bid—their sale price—was decreased by the Defendants' illegal conduct.

The Complaint, however, which must be taken as true for purposes of the instant motion, alleges that "spreads" on Class Securities were "raised, fixed and maintained at artificially inflated and supra-competitive levels"; and that as a result of "these artificially inflated and supra-competitive spreads, the prices paid for Class Securities" by Class members were "artificially inflated," and the "prices realized from the sale of Class Securities" were "artificially depressed." Complaint, ¶ 120. Thus, the conspiracy alleged by Plaintiffs is a conspiracy to fix the price of Defendants' market-making service, which is charged both to the buyers and sellers of Class Securities. As stated by Plaintiffs' expert, Professor Barclay:

> . . . . All members of the plaintiffs' class in this litigation are purchasers of market-making services. . . . Class members paid for market-making services, through the spread, every time they bought securities *and* every time they sold securities.

Each buyer and seller in the putative Class has an interest in proving the existence of Defendants' conspiracy, and in securing declaratory and injunctive relief to bring an end to that conspiracy. Moreover, every buyer and every seller has the same interest in maximizing the aggregate amount of class-wide damages. *See Bacon v. Toia,* 437 F.Supp. 1371, 1381 (S.D.N.Y.1977), *aff'd,* 580 F.2d 1044 (2d Cir.1978).

The conflict to which Defendants refer relates only to the apportionment of the damages as between purchasers and sellers. Such hypothetical conflicts regarding proof of damages are not sufficient to defeat class certification at this stage of the litigation.

This Court previously has rejected efforts by Defendants to defeat certification by raising the possibility of hypothetical conflicts or antagonisms among class members, especially regarding proof of damages. In *National Super Spuds, Inc. v. New York Mercantile Exchange,* 77 F.R.D. 361 (S.D.N.Y.1977), holders of Maine potato futures contracts sued short sellers and brokers of such contracts who allegedly conspired to manipulate the market price of such contracts in violation of, *inter alia,* Section 1 of the Sherman Act. Defendants argued that conflicts existed among Class members who purchased and sold their contracts at different times. *Id.* at 370–71. The Court held:

> Plaintiffs have pleaded a continuing course of conduct over the period in question . . . and the Court has great flexibility under rule 23 to deal with conflicts if and when they may arise. Defendants' argument of potential time conflicts is, therefore, insufficient to deny class status.
>
> It is clear from the foregoing that the various claims of 'conflicts' are insubstantial. The interests of the plaintiffs and of all class members in proving a conspiracy . . . throughout the Class Period are identical.

*Id.* at 371.

In *Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975), the Ninth Circuit rejected the argument that alleged seller-purchaser conflicts could provide a basis for denying class certification:

> [Defendants] contend that the interests of class members in proving damages from price inflation (and hence the existence and

materiality of misrepresentations subsumed in proving inflation) irreconcilably conflict, because some class members will desire to maximize the inflation existing on a given date while others will desire to minimize it. For example, they posit that a purchaser early in the class period who later sells will desire to maximize the deflation due to an intervening corrective disclosure in order to maximize his out of pocket damages, but in so doing will conflict with his purchaser who is interested in maximizing the inflation in the price he pays. We agree that class members might at some point during this litigation have differing interests. We altogether disagree, for a spate of reasons, that such potential conflicts afford a valid reason at this time for refusing to certify the class.

*Id.* at 908.

"As a result, courts have generally declined to consider conflicts, particularly as they regard damages, sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue at the very heart of the suit." *Blackie* 524 F.2d at 909. *See also Greene v. Emersons Ltd.*, 86 F.R.D. 47, 61 (S.D.N.Y.1980) ("[w]hile differing interests among class members may ultimately surface, the greater weight of recent authority militates against denying class certification on that ground, at least at this stage of the proceedings"); *Nathan Gordon Trust v. Northgate Exploration, Ltd.*, 148 F.R.D. 105, 108 (S.D.N.Y.1993) (rejecting defendants' argument that alleged conflicts required the elimination of in-and-out traders from the class); *Simon v. Westinghouse Elec. Corp.*, 73 F.R.D. 480, 484 (E.D.Pa.1977) ("... conflicts between buyers and sellers, or between sellers and those who continued to hold relate only to damages, and thus are peripheral to the central issues in this case.").

Even to the extent Defendants are correct that a conflict may later arise as to damages, that possibility does not preclude class certification. In *In re Plywood Anti-Trust Litigation*, 76 F.R.D. 570, 580–82 (E.D.La.1976), the court held:

.... [T]he benefit or detriment to particular class members ... goes to the amount of damages, if any, suffered by them. There is no antagonism within any of the classes with respect to proving that defendants did indeed illegally conspire....

76 F.R.D. at 581–82.

Similarly, in *Sol S. Turnoff Drug Distributors, Inc. v. N.V. Nederlandsche Combinatie Voor Chemische Industrie*, 51 F.R.D. 227 (E.D.Pa.1970) the court rejected defendants' argument that certification of a price-fixing class should be denied due to an alleged conflict:

[A]t least at this stage of the case, all the members of the class ... have a common interest in a favorable verdict on the issue of a conspiracy.... [T]he possibility ... that it may develop that the interests with respect to damages of several groups within the class ... will conflict, cannot at this point justify the denial of a class action.

*Id.* at 233.

The *Blackie* court noted that, if real antagonism later develops among the interests of various class members, the problem could be addressed through the creation of subclasses under Rule 23(c)(4). In *Herbst v. International Telephone and Telegraph Corp.*, 495 F.2d 1308, 1321 (2d Cir.1974), the Second Circuit affirmed a district court opinion which addressed this issue as follows:

If it appears at some time in the future that the proper allocation of damages would be effectuated by the designation of appropriate subclasses, it is undisputed that the court has all the power necessary to implement such a procedure. Fed. R.Civ.P. 23(c)(4). In any event, problems well down the road which may be pertinent to the procedures which ultimately should govern the allocation of damages need not and should not provide a roadblock to the prompt and conditional determination of whether this suit may be properly maintained as a class action.

In sum, potential conflicts between buyers and sellers do not provide a basis for denying class certification here. Rather, in order to warrant denial of class certification, it must be shown that any asserted "conflict" is so palpable as to outweigh the substantial interest of every class member in proceeding with

the litigation. Defendants have not made this showing. Accordingly, the Court finds no fundamental conflict or inconsistency between the claims of the proposed class members. *See Caleb v. DuPont De Nemours,* 110 F.R.D. 316, 319 (S.D.N.Y.1986).

### 2. *Qualification of Counsel*

■ Rule 23(a)(4) requires that, in order for a case to proceed as a class action, the court must find that "the representative parties will fairly and adequately protect the interests of the class." The party's attorney must therefore be "qualified, experienced, and generally able to conduct the proposed litigation." *Id.* at 563. *See also Nilsson v. Coughlin,* 670 F.Supp. 1186, 1191 (S.D.N.Y. 1987). Adequacy of representation merely requires that the class representative's attorney be qualified, and that the class representative not have interests conflicting with the class in the litigation at hand. *Sosna v. Iowa,* 419 U.S. 393, 403, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975).

■ The attorneys seeking to represent the class in this case include some of the most experienced lawyers in the United States in the prosecution of antitrust and securities class actions. The firms representing Plaintiffs have represented that they are ready, willing and able to devote the resources necessary to litigate this case vigorously. Accordingly, this prong is satisfied.

### III. *The Requirements of Rule 23(b)*

■ In order to maintain a class action, Plaintiffs must satisfy the requirements of

Rule 23(b) in addition to satisfying the prerequisites of Rule 23(a). Pursuant to Rule 23(b), a class action may be maintained where:

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief for the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Subparts (b)(2) and (b)(3) of Rule 23 are disjunctive, and only one need be satisfied in order to support certification of a class. Plaintiffs request that the Court certify a class pursuant to both Rule 23(b)(2) and (b)(3).[19]

Courts have certified antitrust class actions both under Rule 23(b)(2) and (b)(3) if the requirements of each rule are satisfied.

Nothing in the language of Rule 23 precludes certification of both an injunctive class and a damages class in the same action. In fact, where injunctive relief and damages are both important components of the relief requested, court[s] have regularly certified an injunctive class under Rule 23(b)(2) and a damages class under Rule 23(b)(3) in the same action.

---

**19.** Where a class is certified under Rule 23(b)(3), notice must be provided individually to each class member who can be identified through reasonable efforts. *See* Fed.R.Civ.P. 23(c)(2). Notice under Rule 23(b)(2) is flexible, and may consist entirely of published notice in appropriate circumstances.

Here, a Subclass will be certified consisting of Class members who, at the time of class notice, are current customers of Defendants and to whom Defendants send periodic mailings. As to this Subclass, the notice requirement of (b)(3) can be satisfied by an insert in Defendants' regular monthly mailing, at Plaintiffs' expense. *See, e.g., Sollenbarger v. Mountain States Telephone & Telegraph Co.,* 121 F.R.D. 417, 437 (D.N.M.1988) (telephone company required to enclose antitrust class notice in defendant's monthly billing envelopes); *In re Domestic Air Transportation Anti-*

*trust Litigation,* 141 F.R.D. 534, 549–52 (N.D.Ga. 1992) (rejecting defendants' objections to inclusion of notice in the defendants' inflight magazines). As the Supreme Court noted with approval in *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 355, 98 S.Ct. 2380, 2391, 57 L.Ed.2d 253 (1978), "a number of courts have required defendants in Rule 23(b)(3) class actions to enclose class notices in their periodic mailings to class members in order to reduce the expense of sending the notice." (citing, *inter alia, Ste. Marie v. Eastern R.R. Assn.,* 72 F.R.D. 443, 450 n. 2 (S.D.N.Y.1976), *aff'd,* 650 F.2d 395 (2d Cir. 1981); *Gates v. Dalton,* 67 F.R.D. 621, 633 (E.D.N.Y.1975); *Popkin v. Wheelabrator–Frye, Inc.,* 20 Fed. Rules Serv.2d 125, 130, 1975 WL 384 (S.D.N.Y.1975)). Such "piggyback notice" will significantly reduce the cost of providing mailed notice under Rule 23(b)(3).

*Davis v. Southern Bell Telephone & Telegraph Co.*, 1993–2 CCH Trade Cases ¶ 70,-480, 71,604, 1993 WL 593999 (S.D.Fla.1993) (citing *Waldrip v. Motorola, Inc.*, 85 F.R.D. 349 (N.D.Ga.1980); *Marshall v. Electric Hose & Rubber Co.*, 68 F.R.D. 287 (D.Del. 1975)). *See also In re Domestic Air Transportation Antitrust Litigation*, 137 F.R.D. 677, 696 (N.D.Ga.1991); *In re Catfish Antitrust Litigation*, 826 F.Supp. 1019, 1045–46 (N.D.Miss.1993); 1 *Newberg on Class Actions* § 4.14 at 4–49—4–51.

### A. The Class Will Be Certified Under Rule 23(b)(2) Because Injunctive Relief Is Appropriate

Plaintiffs' Complaint seeks the following relief:

(b) That the unlawful combination and conspiracy alleged herein be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

\* \* \* \* \* \*

(d) That Defendants be preliminarily and permanently enjoined from continuing the unlawful combination or conspiracy alleged herein.

Complaint ¶ 124.

■ Certification is appropriate under Rule 23(b)(2) where declaratory or injunctive relief is an important aspect of the overall relief sought. *Gelb v. American Telephone & Telegraph Co.*, 150 F.R.D. 76, 78 (S.D.N.Y. 1993). *See also In re Catfish Antitrust Litigation*, 826 F.Supp. at 1045–46; *Northwestern Fruit Co. v. A. Levy & J. Zentner*, 116 F.R.D. 384, 388 (E.D.Cal.1986); *Davis*, 1993–2 CCH Trade Cases ¶ 70,480 at 71,604. As reasoned in *Weiss v. York Hospital*, 745 F.2d 786, 811 (3rd Cir.1984), another antitrust case:

The class in this case is a classic (b)(2) class in that the Defendants have "acted or refused to act on grounds generally applicable to the class" and the primary relief sought is an injunction.... When a suit seeks to define the relationship between the defendant(s) and the world at large, as in this case, (b)(2) certification is appropriate.

■ Here, Plaintiffs have alleged a combination or conspiracy which has had the effect of significantly widening spreads on Class Securities. Plaintiffs specifically allege that Defendants' combination or conspiracy is continuing. Complaint ¶ 117. Unless enjoined and made subject to the appropriate equitable relief, Defendants' alleged conspiracy will continue to inflate spreads for the benefit of Defendants and to the detriment of the Class.

Defendants contend that Plaintiffs primarily seek monetary damages, in the form of antitrust treble damage, and that under these circumstances, class certification under section 23(b)(2) is inappropriate. *See* The Advisory Committee Note to the 1966 Amendment of Rule 23 ("subdivision 23(b)(2) does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages").

In support of this contention, Defendants rely on cases from this Circuit holding that Subsection (b)(2) is applicable only where the relief sought is exclusively or predominantly injunctive or declaratory, and not where antitrust treble damages are a prominent feature of the relief sought. *Eisen v. Carlisle and Jacquelin*, 391 F.2d 555, 564 (2d Cir.1968); *see also Gelb*, 150 F.R.D. at 78; *Milonas v. Hess*, 1976–2 Trade Cas. (CCH) ¶ 61,069 at 69, 818–19 & n. 2, 1976 WL 1312 (S.D.N.Y. 1976); *Robertson v. National Basketball Ass'n*, 389 F.Supp. 867, 900 (S.D.N.Y.1975); *Free World Foreign Cars, Inc. v. Alfa Romeo*, 55 F.R.D. 26, 30 n. 9 (S.D.N.Y.1972); *Coniglio v. Highwood Serv., Inc.*, 60 F.R.D. 359, 363 (W.D.N.Y.1972); *United Equities Co. v. New York Tel. Co.*, No. 70 Civ. 4379, 1971 WL 4730, at \*3–4 (S.D.N.Y. June 18, 1971).

Defendants note that Plaintiffs have not alleged that all of the members of the purported injunctive class intend to trade in Class Securities in the future, and that Plaintiffs have alleged that the "relevant time period" of the Complaint ended almost two years ago, in May 1994. Complaint ¶ 83. Finally, Defendants contend that imposing injunctive relief on such a massive scale would inappropriately involve this Court in the day-to-day trading operations of Nasdaq,

a large, high volume securities market. *See National Auto Brokers Corp.*, 60 F.R.D. at 492 (in antitrust pricing case, "to attempt to grant injunctive relief on a mass basis would violate the applicable provision of the antitrust laws."); *United Equities Co.*, No. 70 Civ. 4379, 1971 WL 4730, at \*3 (S.D.N.Y. June 18, 1971) ("The injunction asked for is an order directing the defendants to cease and desist from the activities complained of . . . This injunction is as impractical as it is nebulous. It would involve the court in day-to-day supervision . . .").

As stated in the *In re Catfish Antitrust Litigation*, 826 F.Supp. 1019, 1046 (N.D.Miss.1993), however, "more recent trends in Rule 23(b)(2) utilization appear to favor a broader application of equitable relief certification" even where damages also are sought. *See also Vulcan Society v. Fire Department of City of White Plains*, 82 F.R.D. 379, 402 (S.D.N.Y.1979).

Defendants' contention that plaintiffs primarily seek antitrust treble damages is insufficient to defeat class certification under Rule 23(b)(2). In the event Plaintiffs are able to prove the existence and effect of the alleged conspiracy, the requested declaratory and injunctive relief will be necessary to ensure that Nasdaq investors are not harmed in the future by Defendants' anticompetitive conduct. Moreover, the Proposed Consent Decree submitted in the Government Action demonstrates that significant changes in Nasdaq's operation are necessary to eliminate the practices of which Plaintiffs complain.

Thus, the requested declaratory and injunctive relief is a significant component of the overall relief which plaintiffs seek. Class certification under Rule 23(b)(2) therefore appropriate.

### B. *The Class Will Be Certified Under Rule 23(b)(3)*

#### 1. *Predominance of Common Issues*

██ To certify a case under Rule 23(b)(3), a court must find that the common issues of law and fact predominate over individual issues. The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions and render the class action valueless. *Milberg v. Lawrence Cedarhurst Federal Sav. & L. Ass'n.*, 68 F.R.D. 49, 52 (E.D.N.Y.1975), citing *inter alia, Dolgow v. Anderson*, 43 F.R.D. 472 (E.D.N.Y.1968).

To recover damages, Plaintiffs will have to prove:

(1) that defendants violated the antitrust laws; (2) that the alleged violations caused plaintiffs to suffer some direct [antitrust] injury to their business or property; and (3) that the extent of this injury can be quantified with requisite precision.

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969), *rev'd on other gds*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *see also Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *U.S. Football League v. National Football League*, 842 F.2d 1335, 1377 (2d Cir.1988).

██ Plaintiffs' burden on this motion for class certification is to establish that common proof will predominate at trial with respect to these three essential elements of antitrust liability. *See Daniels v. Amerco*, 1983–1 Trade Cas. (CCH) ¶ 65,274 at 69,313, 1983 WL 1794 (S.D.N.Y.1983).

As set forth above in the discussion of the commonality requirement of Rule 23(a), Plaintiffs, in order to prove the existence and scope of the alleged conspiracy, will have to submit evidence regarding the following issues:

(1) whether Defendants and their co-conspirators engaged in a combination or conspiracy to raise, fix and maintain Nasdaq spreads at supra-competitive levels;

(2) the implementation, duration and scope of Defendants' combination or conspiracy;

(3) whether each defendant was a participant in the combination or conspiracy;

(4) whether Defendants' conduct violated Section 1 of the Sherman Act;

(5) whether Defendants took affirmative steps to conceal their combination or conspiracy;

(6) the effectiveness of Defendants' combination or conspiracy;

(7) whether Plaintiffs and the members of the Class are entitled to injunctive relief, and the appropriate contours of that relief;

(8) the appropriate measure of damages and the amount of damages suffered by the Class as a whole.

Each of these issues will be addressed in greater detail below.

#### a. *The Existence of Defendants' Conspiracy*

■■■ Since a single conspiracy is alleged, the relevant proof of this will not vary among class members, and clearly presents a common question fundamental to all class members. *See, e.g., Uniondale Beer Co., Inc. v. Anheuser–Busch, Inc.,* 117 F.R.D. 340, 342 (E.D.N.Y.1987); *In re Alcoholic Beverages Litigation,* 95 F.R.D. 321, 324 (E.D.N.Y. 1982); *Fisher Bros. v. Mueller Brass Co.,* 102 F.R.D. 570, 574–75 (E.D.Pa.1984).

Courts repeatedly have held that the existence of a conspiracy is the predominant issue in price fixing cases, warranting certification of the class even where significant individual issues are present. *See e.g., Rios,* 100 F.R.D. at 407–08; *Jennings Oil Co.,* 80 F.R.D. at 130; *City of New York v. Darling–Delaware,* 1976–1 CCH Trade Cases ¶ 60,812 at 68,513, 1976 WL 1234 (S.D.N.Y.1976) (although customized and diverse services were negotiated and priced separately for each customer, proof of conspiracy predominates); *Carnivale Bag Co. v. Slide–Rite Mfg. Co.,* 1976–2 CCH Trade Cases ¶ 61,032 at 69,562, 1976 WL 1299 (S.D.N.Y.1976) (finding predominance of common issues based on allegations of conspiracy, even though elements of impact and damages would have to be litigated individually); *In re Master Key Antitrust Litig.,* 70 F.R.D. 23, 26 (D.Conn.1975) (characterizing question of the existence of a conspiracy as "the central and common element of these cases"); *Shelter Realty,* 75 F.R.D. at 37 (despite customized services priced separately for each plaintiff, existence of a conspiracy is a predominating issue "when allegations of anti-competitive behavior embracing all of the various products and distribution patterns have been credibly plead-

ed."); *Kromer v. Saks & Co.,* 1977–2 CCH Trade Cases ¶ 61,771 at 73,186, 1977 WL 1513 (S.D.N.Y.1977) ("other questions regarding damages and the like are subordinate to the common question of the existence of the alleged conspiracy"); *Barr v. WUI/TAS, Inc.,* 66 F.R.D. 109, 115 (S.D.N.Y. 1975); *Professional Adjusting Systems of America, Inc. v. General Adjustment Bureau, Inc.,* 64 F.R.D. 35, 40–42 (S.D.N.Y. 1974).

In order to recover, each Plaintiff class member will have to prove the existence of the Defendants' conspiracy to fix spreads. Plaintiffs have stated that, as common proof of the existence of the alleged conspiracy, they intend to submit, *inter alia,* certain documents already produced by Defendants, including internal Nasdaq memoranda acknowledging the widening of Nasdaq spreads; academic studies, including the one by Professors Christie and Schultz, describing the widening Nasdaq spreads and the absence of odd-eighths quotations; and documents demonstrating the narrowing of the spreads following the publicity surrounding the Christie and Schultz study.

Proof of the alleged single conspiracy will also involve evidence of conspiratorial statements and conduct, including the contents of taped telephone conversations, attributable to Defendants, which will not vary among the class members. *See, e.g., In re Catfish Antitrust Litigation,* 826 F.Supp. at 1039 ("evidence of a national conspiracy to fix the price of catfish and processed catfish would revolve around what Defendants did, and said, if anything, in pursuit of a price fixing scheme"); *Transamerican Refining Corp. v. Dravo Corp.,* 130 F.R.D. 70, 75 (S.D.Tex. 1990) (proof of conspiracy is susceptible to generalized proof since the focus is on what defendants said and did). *See also, e.g., National Super Spuds v. New York Mercantile Exchange,* 77 F.R.D. 361, 363 (S.D.N.Y.1977).

Defendants contend that Plaintiffs' Complaint alleges not a single conspiracy but thousands of mini-conspiracies, and that each Plaintiff will need to submit individualized proof that the particular market-maker with whom that Plaintiff traded was involved in

the conspiracy to eliminate odd-eighths quotations. A plain reading of the Complaint, however, confirms Plaintiffs' characterization of their Complaint, the allegations of which must be taken as true for purposes of the instant motion. Moreover, because, as set forth below, the antitrust law provides for joint and several liability of co-conspirators, each Plaintiff will have an equal incentive to generally prove the Defendants' participation in the alleged conspiracy.

As held in the *In re Sugar Industry Antitrust Litigation*, 73 F.R.D. at 345:

> In this litigation, it is the allegedly unlawful horizontal price-fixing arrangement among defendants that, in its broad outlines, comprises the predominating, unifying common interest as to these purported plaintiff representatives and all possible class members. Hence, the existence, implementation and effect of this alleged conspiracy ... are the central issues.... A common thread of evidence is admissible on these elements and will correspond to evidence which otherwise could be introduced by absent class members.

In sum, proof of Defendants' conspiracy lies at the heart of this case and is common to the Class.

### b. *The Implementation, Duration And Scope Of Defendants' Combination Or Conspiracy*

 In order to recover, each Plaintiff Class member will have to prove the implementation of the Defendants' conspiracy, and the mechanisms used to enforce or police that conspiracy. The relevant proof in this area will include direct as well as economic evidence of: the effective elimination of odd-eighth quotations for Class Securities; the causal relationship between the absence of odd-eighth quotations and the increased spreads for Class Securities; and the reintroduction of odd-eighths that caused a dramatic reduction in spreads following publicity about collusion.

Plaintiffs also intend to introduce economic and direct evidence regarding the scope of Defendants' conspiracy, including evidence of what securities were subject to Defendants' anticompetitive conduct, and the respective time periods for which each stock was effectively targeted.

Plaintiffs have already disclosed the methodology by which the list of Class Securities was compiled; according to Plaintiffs' expert, that methodology was used without differentiation between class members and with regard to all class members, and is therefore presents a common issue that predominates over individual issues.

### c. *Whether Each Defendant Participated In The Combination Or Conspiracy*

 Liability for antitrust violations is joint and several. *See Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 635, 101 S.Ct. 2061, 2064, 68 L.Ed.2d 500 (1981); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 342–48, 91 S.Ct. 795, 808–11, 28 L.Ed.2d 77 (1971). Each Class member may therefore recover his or her full loss from any defendant who can be shown to have participated in the alleged conspiracy. *See, e.g., In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1257 (7th Cir. 1980). Every Class member therefore has an interest in establishing the liability of each Defendant, and evidence as to the participation and liability of each defendant is common to the claim of every Class member.

### d. *Whether Defendants' Combination Or Conspiracy Violated Section 1 Of The Sherman Act*

 A determination of whether Defendants' conduct violates relevant antitrust law is a question of law common to all Plaintiffs. Likewise, nearly all the Defendants have raised primary jurisdiction and implied antitrust immunity as affirmative defenses in their answers to the Complaint. These affirmative defenses also present legal issues common to the entire class.

### e. *Whether Defendants Took Affirmative Steps To Conceal Their Combination Or Conspiracy*

 Plaintiffs have alleged that the statute of limitations has been tolled by reason of Defendants' fraudulent concealment of their conspiracy. Complaint ¶ 118. In order

to show fraudulent concealment, an antitrust plaintiff must prove (1) that the defendant concealed the existence of the antitrust violation, (2) that plaintiff remained in ignorance of the violation until sometime within the four year antitrust statute of limitations; and (3) that his continuing ignorance was not the result of lack of diligence. *State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir.1988). Plaintiffs may prove concealment by showing either that the Defendants took affirmative steps to prevent plaintiffs' discovery of the conspiracy, or that the conspiracy itself was inherently self-concealing. *Id.*

■ Defendants contend that Plaintiffs have placed at issue the time at which each individual Plaintiff had, or should have had, actual knowledge of the conspiracy, as well as each Plaintiff's diligence in ascertaining information with respect to her trading and her dealings with a broker. According to Defendants, such issues of knowledge and diligence are inherently individual.

Defendants concede, however, that these individual issues have been held to bar class certification only where they constitute the majority of Plaintiffs' proof of concealment. Courts have overwhelmingly held that, even when the issue of fraudulent concealment involves both common and individual questions, the common question of whether Defendants successfully concealed the existence of the alleged conspiracy predominates over any individual questions regarding the knowledge or diligence of individual plaintiffs. *See Town of New Castle v. Yonkers Contracting Co., Inc.*, 131 F.R.D. 38, 42–43 (S.D.N.Y.1990); *Fisher Bros. v. Mueller Brass Co.*, 102 F.R.D. 570 (E.D. Pa 1984); *In re Art Materials Antitrust Litigation*, 1983–1 CCH Trade Cases ¶ 65,315 at 69,868, 1983 WL 1802 (N.D.Ohio 1983).

Here, Plaintiffs allegations of concealment include allegations common to all Plaintiffs, including allegations that Defendants: actively misrepresented the competitiveness of the Nasdaq market; falsely and publicly denied price-fixing; provided false rationales for the magnitude of Nasdaq spreads; and wrongly disparaged the Christie and Schultz study which indicated the existence of price-fixing.

Insofar as the individual Plaintiffs are all members of the investing public, their knowledge and diligence with respect to the information Defendants allegedly concealed from the public can be litigated collectively, without significant reference to individual differences in knowledge or diligence. Accordingly, each of Plaintiffs' allegations is susceptible to common proof.

**f. The Effectiveness Of Defendants' Conspiracy**

■ Plaintiffs have identified the securities which they allege were affected by Defendants' anticompetitive conduct and have disclosed the methodology by which that list was compiled. The same methodology was used without differentiation between class members and with regard to all class members. That methodology therefore is common to the class.

Plaintiffs intend to prove the effectiveness of Defendants' conspiracy by using economic theory, academic studies, data sources, and statistical techniques—all designed to demonstrate that Nasdaq spreads were actually widened as a result of the conspiracy—that are common to the entire class.

**g. Whether Plaintiffs Are Entitled To Injunctive Relief, And The Appropriate Contours Of That Relief**

■ In order to establish a claim for equitable relief, the plaintiffs must establish: (1) that they are suffering actual or threatened injury as a result of the illegal conduct of the Defendants; (2) that the actual or threatened injury is reasonably traceable to the challenged conduct; and (3) that the alleged injury is likely to be redressed by the requested relief. *See German*, 885 F.Supp. at 559. Each of these elements is common to the class. Likewise, the contours of appropriate equitable relief will be a common question of critical importance at trial.

**h. The Appropriate Measure Of Damages And The Amount Of Damages Suffered By The Class As A Whole**

**(i) Methodologies**

■ Plaintiffs have disclosed the following methodologies by which they propose to

prove the existence and measure of damages suffered by the Class:

1. Comparing spreads (and resulting revenues) on Class Securities with spreads (and resulting revenues) on comparable securities traded on other markets, such as the New York Stock Exchange or American Stock Exchange;

2. Comparing spreads (and resulting revenues) before and after certain Class Securities moved from trading on Nasdaq to trading on the New York Stock Exchange or the American Stock Exchange;

3. Comparing spreads (and resulting revenues) for Class Securities traded on Nasdaq, before publicity about collusion in late May, 1994 and before publicity about the commencement of the Department of Justice investigation, with spreads (and resulting revenues) for the same securities after such publicity;

4. Comparing spreads (and resulting revenues) for Class Securities traded on Nasdaq with spreads (and resulting revenues) on other Nasdaq National Market securities traded on Nasdaq;

5. Comparing spreads (and resulting revenues) for Class Securities traded on Nasdaq with spreads (and resulting revenues) for the same securities traded on alternative markets, such as Instinet;

6. Comparing Defendants' profits (as well as revenues and costs) from spreads on Class Securities with benchmarks (including but not limited to profits from spreads on other Nasdaq National Market securities traded on Nasdaq, profits after publicity about collusion or the DOJ investigation, or profits from spreads for the same or comparable securities traded on other markets).

These potential classwide measures of injury and damages may be used in combination with one another to yield a single formula or measure.

Each of these methodologies is common to the class, and the validity of each will be adjudicated at trial based upon economic theory, data sources, and statistical techniques that are entirely common to the class. Once a measure of damages is established, it can be applied to the aggregate trading volumes in Class Securities to determine aggregate damages for the Class as a whole, or to individual transactions to determine damages for individual Class members.

The above-described methodologies are widely accepted means of measuring damages in antitrust cases. In ABA Antitrust Section, *Antitrust Law Developments* (3d ed. 1992) the law on "Calculation of Damages" is summarized as follows:

> In price-fixing cases ... the measure of damages in a suit by a purchaser normally is the difference between the price the plaintiff paid and the price he would have paid absent the violation....
>
> Several different methodologies have been developed for proving damages. The "before and after" theory compares ... the prices [plaintiff] paid during the period the violation continued with ... prices paid prior to the beginning of the violation or after its termination. The "yardstick" approach compares profits earned or prices paid by the plaintiff with the corresponding data for a firm or in a market unaffected by the violation....
>
> The "before and after," [and] "yardstick" ... theories are not the only acceptable methodologies.... Courts have also accepted ... damage models combining elements of both the "before and after" and "yardstick" methodologies; and analyses of the defendant's costs and profits. In practice, plaintiffs will often present alternative damage methodologies.

ABA Antitrust Section, *Antitrust Law Developments* (3d ed. 1992) at 669–673, and cases cited therein.

Methodologies of this kind likewise have been cited with approval by numerous courts in granting class certification. *See, e.g., In re South Central States Bakery Products Antitrust Litig.,* 86 F.R.D. 407, 422 (M.D.La. 1980) (certifying class based on representations that impact of Defendants' conspiracy could be shown by using at least one of four accepted methods, or a combination of these methods: comparing prices in different geographical regions, comparing prices and profits of conspirators versus non-conspirators, comparing prices in comparable markets, and

comparing prices or profits before and after termination of the conspiracy); *In re Domestic Air Transportation Antitrust Litig.*, 137 F.R.D. 677, 689–90, 692 (N.D.Ga.1991) (certifying 12.5 million member class where plaintiffs presented potential statistical methodologies for proving injury); *In re Corrugated Container Antitrust Litigation*, 80 F.R.D. 244, 251–52 (S.D.Tex.1978) (class certified based on prediction that injury could be determined to a "reasonable degree of certainty" by "either of two generally accepted methodologies"); *In re Potash Antitrust Litigation*, 159 F.R.D. 682, 697–98 (D.Minn. 1995).

The Court need not decide at this juncture what approach is best suited to the particularities of this case. It is sufficient to note at this stage that there are methodologies available, and that Rule 23(c)(1) and (d) allow ample flexibility to deal with these issues.[20]

As recently held by the Court in *In re Disposable Contact Lens Antitrust Litig.* (MDL 1030) (M.D.Fla. Sept. 5, 1996), in which class of between 15 and 18 million members was certified, the fact "[t]hat defendants' expert disagrees with the methodology and conclusions propounded by [plaintiff's expert] is not reason to deny class certification. Whether or not plaintiffs will be successful in persuading the jury that there has been a common impact remains to be seen." *Id.* at 12.

### (ii) *Procedural Issues*

As well as the various substantive methodologies outlined above, a wide variety of procedural approaches will ultimately be available to the Court in determining when and how to deal with damages. *See* 1 *Newberg on Class Actions* § 4.26 at 4–91–97; *In re Potash*, 159 F.R.D. at 698 ("various judicial

methods are available to resolve individual damage issues" including "bifurcating liability and damages", "appointing special masters", or "using defendants' transactional records").

Price fixing cases such as this one often involve relatively small injuries to a relatively large number of people. Based on the Defendants' own records, a jury may reasonably estimate damages. *See, e.g., Greenhaw,* 721 F.2d at 1024–25; *In re Domestic Air Transp.*, 137 F.R.D. at 692–93; *In re Potash,* 159 F.R.D. at 698 (noting the possibility of using the defendants' transactional records to compute individual damages); *In re Antibiotic Antitrust Actions,* 333 F.Supp. 278, 281 (S.D.N.Y.1971) (court allowed plaintiffs to establish an aggregate quantum of classwide damages, but provided that individual class members would have to file claim to justify their entitlement to receive a portion of this sum); *In re Melridge, Inc. Securities Litigation,* 837 F.Supp. 1076, 1080 (D.Or. 1993) (court allowed proof of classwide damages and entered judgment in favor of class based on the jury's aggregate verdict; individual claims were to be determined using a measure of damages adopted by the jury, and applied to purchases as evidenced by individual proofs of claim).

Courts have allowed the plaintiffs to establish the measure of damages at trial, and this measure is then applied to the individual transactions (typically in a second bifurcated proceeding following trial on the common issues). *See, e.g., Dennis v. Saks & Co.,* 1975–2 CCH Trade Cases ¶ 60,396 at 60,749, 1975 WL 909 (S.D.N.Y.1975); *Hedges Enterprises, Inc. v. Continental Group,* 81 F.R.D. 461, 476 (E.D.Pa.1979). *See also Shelter Realty,* 75 F.R.D. at 38 ("formulary approach to the calculation of damages.").

---

**20.** Rule 23(c)(1) provides in relevant part that any order certifying a class "may be altered or amended before the decision on the merits." Rule 23(d) provides in relevant part that the Court may make "appropriate orders" dealing with "procedural matters", which may be altered or amended "from time to time", including orders "determining the course of proceedings or prescribing measures to prevent undue repetition or complication in the presentation of evidence or argument". Rule 23(d) provides that these orders "may be combined with an order under

Rule 16". Rule 16(c) provides that "the court may take appropriate action" with respect to *inter alia:* "the avoidance of unnecessary proof and of cumulative evidence"; "the possibility of obtaining admissions of fact and of documents which will avoid unnecessary proof"; "an order establishing a reasonable limit on the time allowed for presenting evidence"; "an order for a separate trial pursuant to Rule 42(b) with respect to a claim ... or with respect to any particular issue in the case"; or "referring matters to a ... master".

Bifurcation has been widely used and in antitrust class actions. *See, e.g., In re Master Key,* 528 F.2d at 14–15 ("bifurcated trials have frequently been employed with great success ... even in antitrust suits....") (citing *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975)); *Green v. Wolf Corp.,* 406 F.2d 291, 301 (2d Cir.1968) (bifurcation in securities class action); *City of New York v. Darling-Delaware, Inc.,* 1976–1 CCH Trade Cases ¶ 60,812, 1976 WL 1234 (S.D.N.Y.1976) (bifurcating damages in price-fixing class action).

### (iii) *Individualized Damages*

 Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was affected generally. As held in *Hedges Enterprises, Inc. v. Continental Group, Inc.,* 81 F.R.D. 461, 475 (E.D.Pa.1979), certifying the class notwithstanding negotiated prices:

> The proof necessary to demonstrate that the defendants conspired to maintain an inflated "base" from which all pricing negotiations began and that this "base" price was higher than the "base" price which would have been established by competitive conditions would be common to all members of the class. Proof of a conspiracy to establish a "base" price would establish at least the fact of damage, even if the extent of the actual damages suffered by the plaintiffs would vary.... [T]he proof with respect to the "base" price from which these negotiations began, or the structure of the conspiracy to affect individual negotiations, would be common to the class. Accordingly ... the fact of damage is predominantly, if not entirely, a common question.

 Even if it could be shown that some individual class members were not injured, class certification, nevertheless, is appropriate where the antitrust violation has caused widespread injury to the class. As stated in *Presidio Golf Club v. National Linen Supply Corp.,* 1976–2 CCH Trade Cases ¶ 61,221 at 70,630–31, 1976 WL 1359 (N.D.Cal.1976), *quoting Blackie,* 524 F.2d at 906 n. 22:

> [A]s a practical matter, to prove an effective conspiracy to fix prices, facts will be adduced which will tend to establish, perhaps circumstantially, that each class member was injured.... [I]n the class action context the inference is predicated on the establishment of certain facts: (1) an antitrust violation, typically a conspiracy to fix prices or allocate markets; (2) an ability on the part of defendant-conspirators to effectuate the conspiracy; (3) generalized price increases or damages in the industry involved; and (4) purchase or, as here, rental by plaintiffs during the period of anti-competitive activity.... Contrary to defendants' contention part of plaintiffs' prima facie case will not require proof that overcharges were imposed upon the rental of each item rented to plaintiffs. "[T]he impact element necessitates only an illustration of generalized injury."

> \*　　\*　　\*　·　\*　　\*　　\*

> [T]he fact that certain members of plaintiffs' class escaped injury altogether would not preclude certification or destroy the class's prima facie case of impact. Unless it is clear that no ultimate consumers were damaged, the exact amount each may have sustained is an issue to be treated at the damages phase of the litigation. *In re Western Liquid Asphalt, supra* [487 F.2d 191, 200] at 123 [ (9th Cir.1973) ]. "The fact that a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones; plaintiffs satisfy their burden of showing causation as to each by showing [generalized damage] as to all."

Other courts have likewise held that the predominance requirement of Rule 23(b)(3) is satisfied with respect to proof of injury, even though individualized inquiry may be necessary on the quantum of damages. *See e.g., Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 456 (3d Cir.1977); *In re Master Key,* 70 F.R.D. at 25–26; *In Re Potash,* 159 F.R.D. at 697–98; *In re Catfish,* 826 F.Supp. at 1042–43; 4 Newberg on Class Actions § 18.27 at 18–89 ("Individual damages questions do not preclude a Rule 23(b)(3) class action when the issue of liability is common to the class.").

Indeed, decisions in this District have recognized that if individual damage questions were a barrier to class certification, "there would be little if any place for the class action device in the adjudication of antitrust claims." *Shelter Realty,* 75 F.R.D. at 37. *See also e.g., Hill v. A–T–O, Inc.,* 80 F.R.D. 68, 70 (E.D.N.Y.1978) (although "damages in this case may have to be determined on an individual basis," this "does not preclude class action certification, where, as here, the common issues which define liability predominate"); *National Super Spuds,* 77 F.R.D. at 372; *Maywalt,* 147 F.R.D. at 56, 57 (differences regarding damages among class members not sufficient to defeat class certification) (citing *Green v. Wolf Corp.,* 406 F.2d 291, 301 (2d Cir.1968)); *Town of New Castle,* 131 F.R.D. at 42 (citations omitted) ("the fact that each class member's damages will be different and, thus, will require individualized treatment does not prevent one from concluding that common questions predominate."); *Rios,* 100 F.R.D. at 408 (predominance of common issues is not defeated simply because the class members have incurred varying damages); *In re Alcoholic Beverages,* 95 F.R.D. at 327.

In sum, even if it develops that each class member's damages must be separately determined, class certification would still be appropriate. *See e.g., In re Master Key,* 70 F.R.D. at 27–28; *Shelter Realty,* 75 F.R.D. at 37; *In re Alcoholic Beverages,* 95 F.R.D. at 328. Under those circumstances, bifurcation would allow classwide issues to proceed on a class basis, while reserving any individual issues to be litigated in a subsequent set of proceedings. *See Green v. Wolf,* 406 F.2d at 301; *In re Master Key,* 70 F.R.D. at 28–29; *Bresson v. Thomson McKinnon Securities Inc.,* 118 F.R.D. 339, 343 (S.D.N.Y.1988); *Dennis,* 1975–2 CCH Trade Cases ¶ 60,396 at 66,749; *Darling–Delaware Inc.,* 1976–1 CCH

Trade Cases ¶ 60,812 at 68,514 (S.D.N.Y. 1976).

### (iv) *Aggregate Damages*

■ Due to the nature of the Nasdaq market and the availability of computerized data, the aggregate damages of the Class as a whole may be susceptible to determination in a single trial along with the issue of liability. Indeed, as a result of the computerized databases of the NASD, and of Defendants themselves, the data relevant to aggregate damages here may be susceptible to being assembled and organized in a relatively straightforward manner.

There is case support for basing the class certification in part on a finding that damages can best be determined on a classwide basis. In *In re Antibiotic Antitrust Actions,* 333 F.Supp. 278, 281 (S.D.N.Y.), *amended,* 333 F.Supp. 291 (S.D.N.Y.), *mandamus den'd,* 449 F.2d 119 (2d Cir.1971), plaintiffs alleged price fixing in the sale of antibiotic drugs to millions of consumer class members. Defendants asserted that individual issues of damages were predominant and that the case was unmanageable. The court certified the class, concluding that the amount of damages could be determined on a classwide basis, because:

It is far simpler to prove the amount of damage to the members of the class by establishing their total damages than by collecting and aggregating individual damage claims as a sum to be assessed against the defendants. And it is the court's tentative conclusion that this can be done without sacrificing the rights of the defendants.

333 F.Supp. at 281.[21]

The court held that the defendants had no constitutional right to compel the plaintiffs to establish damages individually, rather than from defendants' own records:

---

**21.** ·The court in the *In re Antibiotic Antitrust Actions* envisioned that the determination and allocation of individual damages would occur in an administrative process, rather than in a second trial phase:

Damages would be awarded on a class-wide basis, if and when liability was established, and

individual claims could then be processed administratively after entry of judgment.

333 F.Supp. at 283. In a subsequent opinion, the Court followed up on its tentative decision that the class would be manageable by finding, on a more developed record, that the class in fact was manageable. *In re Antibiotic Antitrust Actions,* 333 F.Supp. 291 (S.D.N.Y.1971).

Most important management decisions in the business world in which these defendants operate are made through the intelligent application of statistical and computer techniques and these class members should be entitled to use the same techniques in proving the elements of their cause of action. The court is confident that they can be successfully utilized in the courtroom and that their application will allow the consumers to protect their rights while freeing the court and the defendants of the specter of unmanageability. In these circumstances the court cannot conclude that the defendants are constitutionally entitled to compel a parade of individual plaintiffs to establish damages.

333 F.Supp. at 289. The Second Circuit denied the defendants' petition for mandamus on this point. *Pfizer, Inc. v. Lord,* 449 F.2d 119, 120 (2d Cir.1971).

In *Van Gemert v. Boeing Co.,* 553 F.2d 812 (2d Cir.1977), the Second Circuit affirmed an aggregate judgment in a securities class action. Likewise, in *Gerstle v. Gamble–Skogmo, Inc.,* 478 F.2d 1281 (2d Cir.1973), the Second Circuit modified and affirmed an aggregate judgment in a securities class action. In fact, aggregate judgments have been widely used in antitrust, securities and other class actions. *See* cases collected in *Newberg, supra. See also Van Gemert v. Boeing Co.,* 590 F.2d 433, 436 (2d Cir.1978), *aff'd,* 444 U.S. 472, 479–80 and n. 6, 100 S.Ct. 745, 749–50 and n. 6, 62 L.Ed.2d 676 (1980).

*Accord, e.g., Greenhaw v. Lubbock County Beverage Ass'n,* 721 F.2d 1019, 1029 (5th Cir.1983) (aggregated judgment affirmed in antitrust class action); *In re Brand Name Prescription Drugs Antitrust Litigation,* 1994 WL 663590 (N.D.Ill. Nov. 18, 1994) ("[t]he fact of the matter is that the putative class plaintiffs have come forward with seemingly realistic methodologies for proving damages on a class-wide basis"); *In re Sugar Industry,* 73. F.R.D. at 351 ("the most suitable procedure for the determination of damages sustained by the proposed consumer classes in this litigation, if any, is either by an aggregate class-wide approach or through individualized evidence based on proven and accepted statistical methods").

The leading commentator on class actions likewise notes the advantage and viability of proving aggregate class damages:

> In many cases, the class representative in an antitrust suit may prove the amount of damages for the entire class ... thus eliminating the need for individual damage proofs during trial. This approach allows the named plaintiff to show the total class damages caused by the defendant's unlawful conduct.

4 *Newberg on Class Actions,* § 18.53.

The aggregate class damage approach has obvious case management advantages. By eliminating individual damage proofs at trial, the length, complexity and attendant costs of litigation are greatly reduced. As stated in 2 *Newberg on Class Actions* § 10.01 at 10–2:

> Proof of aggregate monetary relief for the class is feasible and reasonable under various circumstances. The evidentiary standard for proof of monetary relief on classwide basis is simple—the proof submitted must be sufficiently reliable to permit a just determination of the defendant's liability within recognized standards of admissible and probative evidence.

Moreover, as noted in *Newberg,* § 10.05:

> Aggregate computation of class monetary relief is lawful and proper. Challenges that such aggregate proof affects substantive law and otherwise violates the defendant's due process or jury trial rights to contest each member's claim individually, will not withstand analysis.

Finally, Defendants contend that the aggregate damage approach would lead to a "fluid class recovery," which has been rejected in this Circuit. *See Abrams v. Interco Incorp.,* 719 F.2d 23, 31 (2d Cir.1983); *Van Gemert v. Boeing Co.,* 553 F.2d 812, 815–16 (2d Cir.1977), *aff'd,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *Eisen v. Carlisle & Jacquelin,* 479 F.2d 1005, 1016–18 (2d Cir.1973), *vacated on other gds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Fluid recovery refers to the distribution of unclaimed or unclaimable funds to persons not found to be injured but who have interests similar to those of the class. *See In re Corrugated Container Antitrust Litigation,*

1980–81 CCH Trade Cases ¶ 63,810, 1981 WL 2020 (S.D.Tex.1981).

In the cases on which Defendants rely, however, damages could not be returned to any meaningful number of class members, and plaintiffs accordingly proposed fluid recovery. Damages in an antitrust class action may be determined on a classwide, or aggregate, basis, without resorting to fluid recovery where the computerized records of the particular industry, supplemented by claims forms, provide a means to distribute damages to injured class members in the amount of their respective damages.

As set forth above, Defendants here are required to maintain detailed computerized records of their transactions, and Plaintiffs propose that those records will provide the means to determine damages on a classwide basis without creating a need to rely on fluid recovery. Accordingly the circumstances here will permit recovery by class members who, by virtue of their membership in the class, have claimed injury caused by Defendants' practices, rather than by a broader class of investors who were not injured but who may be injured by future transactions. *See In re Agent Orange Product Liability Litig.*, 818 F.2d 179, 184–85 (2d Cir.1987) (holding no fluid recovery problem where "the class that will benefit ... is essentially equivalent to the class that claims injury").

### (v) *Causation*

■ With respect to Defendants' argument that the Plaintiff Class will be unable to prove that the Defendants' conspiracy caused Plaintiffs injury, courts have held that this element is also susceptible of common classwide proof, and that, as a general rule, an illegal price-fixing scheme presumptively damages all purchasers of a price-fixed product in an affected market. The court addressed that issue as follows in *Master Key*, 70 F.R.D. at 26 n. 3:

If the plaintiffs introduce proof ... at the liability stage that they bought master key systems and that the defendants engaged in a pervasive nationwide course of action that had the effect of stabilizing prices at supracompetitive levels, the jury may con-clude that the defendants' conduct caused injury to each plaintiff.

Moreover, on defendants' appeal, the Second Circuit stated that:

If the appellees establish at the trial for liability that the defendants engaged in an unlawful national conspiracy which had the effect of stabilizing prices above competitive levels, and further establish that the appellees were consumers of that product, we would think that the jury could reasonably conclude that appellants' conduct caused injury to each appellee. *See In re Ampicillin Antitrust Litigation*, 55 F.R.D. 269, 275–76 (D.D.C.1972); *Illinois v. Harper & Row Publishers, Inc.*, 301 F.Supp. 484 (N.D.Ill.1969). The amount of such injury could then be computed at a separate trial for damages, and appropriate sub-stratification of classes could be utilized to facilitate that determination. *See Union Carbide & Carbon Corp. v. Nisley*, 300 F.2d 561, 567 (10th Cir.1961); *Aamco Automatic Transmissions, Inc. v. Tayloe*, 67 F.R.D. 440 (E.D.Pa.1975); *Sommers v. Abraham Lincoln Federal Savings & Loan Ass'n*, 66 F.R.D. 581, 591–92 (E.D.Pa.1975); *Barr v. WUI/TAS, Inc.*, 66 F.R.D. 109, 115 (S.D.N.Y.1975); *Wainwright v. Kraftco Corp.*, 54 F.R.D. 532, 534–35 (N.D.Ga.1972).

*In re Master Key Antitrust Litigation*, 528 F.2d 5, 12 n. 11 (2d Cir.1975). *See also, e.g., J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 567, 101 S.Ct. 1923, 1929–30, 68 L.Ed.2d 442 (1981) (jury may "infer antitrust injury"); *Shelter Realty Corp.*, 75 F.R.D. at 37; *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 272 (D.Minn.1989) ("Proof of impact typically follows from proof of a price-fixing conspiracy where the defendants are shown to have sufficient market power."); *Town of New Castle v. Yonkers Contracting Co., Inc.*, 131 F.R.D. 38, 41 (S.D.N.Y.1990) (citing *In re Master Key*, 528 F.2d at 12 n. 11); *In re Folding Carton Antitrust Litigation*, 75 F.R.D. 727, 734 (N.D.Ill.1977) ("Courts have consistently held that an illegal price fixing scheme presumptively impacts upon all purchasers of a price fixed product in a conspiratorially affected market.").

Once the existence of injury is established (by direct evidence or inference from the character of a sustained conspiracy), the proof necessary to set the amount of damages need not be exact. In *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565–68, 101 S.Ct. 1923, 1929–30, 68 L.Ed.2d 442 (1981), the Supreme Court summarized "our traditional rule excusing antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury", as follows:

> In *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–124, [89 S.Ct. 1562, 1576–1577, 23 L.Ed.2d 129] (1969), for example, the Court discussed at some length the fixing of damages.... We accepted the proposition that damages could be awarded on the basis of plaintiff's estimate ...:

> "[D]amage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may 'conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs....'"

In *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, [66 S.Ct. 574, 90 L.Ed. 652] (1946).... [w]e explained:

> "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.... Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery." 327 U.S., at 264–265, [66 S.Ct. at 580].

> Our willingness to accept a degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages.... The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation. But our willingness also rests on the principle articulated in cases such a *Bige-*

*low*, that it does not "come with very good grace" for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.

In sum, the numerous fundamental common issues of fact and law predominate over whatever individual issues may arise in the adjudication of this lawsuit. Accordingly, Plaintiffs have made the showing necessary under the first prong of Rule 23(b)(3).

## 2. The Class Action is Superior to Other Methods of Adjudication

Rule 23(b)(3) requires plaintiffs to demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Given the number of class members injured by Defendants' conspiracy, a class action is not only the most efficient and convenient method to resolve this controversy, it is the only "fair" and "efficient" means to adjudicate this controversy.

Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would be neither 'fair' nor an 'adjudication' of their claims. Moreover, although a large number of individuals may have been injured, no one person may have been damaged to a degree which would induce him to institute litigation solely on his own behalf. *Green v. Wolf Corp.*, 406 F.2d 291, 296 (2d Cir.1968).

As stated in *In re Potash*, 159 F.R.D. at 699:

> Separate proceedings would produce duplicate efforts, unnecessarily increase the costs of litigation, impose an unwarranted burden on this Court and other courts throughout the country, and create the risk of inconsistent results for similarly situated parties. Additionally, the cost associated with individual claims may require claimants with potentially small claim amounts to abandon otherwise valid claims simply because pursuing those claims would not be economical. This in turn would result in unjustly enriching the Defendants; precisely the result antitrust laws are designed to remedy.

In addition, class certification here would partially equalize the bargaining power between plaintiffs as a group and Defendants as a group, and thus improve the chances of an equitable settlement. *See In re A.H. Robins Co., Inc.*, 880 F.2d 709, 739–40 (4th Cir.1989) ("it is 'proper' in determining certification to consider whether such certification will foster settlement. . . ."); *duPont Glore Forgan Inc. v. American Telephone & Telegraph Co.*, 69 F.R.D. 481, 487 (S.D.N.Y.1975) ("The sheer disparity of economic forces suggest a death knell of those claims if individual actions are required.").

The Court foresees no insurmountable problems in the management of this lawsuit. As held in the *In re Sugar Industry*, 73 F.R.D. at 358 (citation omitted):

> The federal bench and bar must remain cognizant of the fact that difficulties in the management of class actions should not lead to a conclusion that class actions are not superior to other available means for the fair and efficient adjudication of the controversy. Manageability problems are significant only if they create a situation that is less fair and efficient than other available techniques.

Courts are generally loath to deny class certification based on speculative problems with case management:

> Three reasons exist for granting class certification when only speculative manageability difficulties are perceived. First, the nature of our judicial system mandates that our courts provide a forum for the redress of injuries, and they should not shirk this responsibility because of conjecture. Secondly, at the outset of litigation, consideration of future manageability is by necessity limited because discovery has not advanced to the point where certain judgments can be made regarding the relative ease or difficulty with which the litigation will progress. Lastly, Rule 23(c)(1), which

requires a court to determine the propriety of a class action as soon as practicable after institution of the lawsuit, also allows the courts the luxury of later altering or amending the class certified before any decision on the merits is rendered. It must be remembered that a determination granting a class action always may be modified upon fuller development of the facts, but a negative determination may sound the death knell of the actions as one for a class of persons or entities.

* * * * * *

> Moreover, denial of class certification because of suspected manageability problems is disfavored among both the courts and the legal commentators because a court refusing to certify a class action on the basis of vaguely perceived manageability obstacles is acting counter to the policy behind Rule 23, and because that court is discounting unduly its power and creativity in dealing with a class action flexibly as difficulties arise.

*In re Sugar Industry*, 73 F.R.D. at 356 (citations omitted).[22]

As noted in *Shelter Realty Corp.*, 75 F.R.D. at 38, "the threat of inundation comes from the prospect of individual, duplicative actions" rather than from a class action. Thus, the size of the class militates in favor of, not against certification. *See, e.g., In re Antibiotic*, 333 F.Supp. at 282–83, 289 and n. 7 (S.D.N.Y.1971) (price-fixing class of several million members certified); *Zachary v. Chase Manhattan Bank*, 52 F.R.D. 532 (S.D.N.Y.1971) (class of over a million certified); *Sollenbarger v. Mountain States Telephone & Telegraph Co.*, 121 F.R.D. 417, 437 (D.N.M.1988) (class of several million telephone customers certified in antitrust action); *Davis v. Southern Bell Telephone & Telegraph Co.*, 1993–2 CCH Trade Cases ¶ 70,480, 1993 WL 593999 (S.D.Fla.1993)

---

**22.** *See also In Re Corrugated Container*, 80 F.R.D. at 253; *Dennis*, 1975–2 CCH Trade Cases ¶ 60,-396 at 66,749 ("It is the court's conclusion that at this point, the defendants' assertion that measuring the impact of the conspiracy and calculating individual damages will be an unmanageable task should not defeat plaintiff's motion. . . . However, when discovery is completed if it appears that, contrary to plaintiffs' assertion no general measure of damages can be proven and that any trial will involve separate analysis of the impact of the conspiracy on thousands of different styles of clothing, then the court, pursuant to the flexibility in Rule 23, will reconsider class certification.").

(class of several million telephone customers certified in antitrust action).

As the Court reasoned in *In re Domestic Air Transportation Antitrust Litigation,* 137 F.R.D. at 693–94, a case involving at least 12.5 million class members:

> "[D]ifficulties in management are of significance only if they make the class action a less 'fair and efficient' method of adjudication than other available techniques." *In re Antibiotic Antitrust Actions,* 333 F.Supp. 278, 282 (S.D.N.Y.1971).

The Court finds a class action the *only* fair method of adjudication for plaintiffs. The individual claims of many class members are so small that the cost of individual litigation would be far greater than the value of those claims.... Thus, if this case is not certified as a class action, a majority of class members would likely abandon their claims even if it can be proven that defendants have conspired to fix prices....

Computers can index and control vast quantities of textual data and scanners are available to enter data automatically onto the computer. These are resources that have only recently become available and that courts must be willing to employ to resolve the dilemma of the massive antitrust case.

.... [D]efendants should not be permitted to avoid responsibility for the magnitude of their alleged conspiracy.

*Accord, e.g., In re Antibiotic Antitrust Actions,* 333 F.Supp. 278.

Defendants contend that individual NASD arbitrations provide an efficient means by which aggrieved investors can pursue their claims against market-makers. Defendants' suggestion, however, serves to highlight the superiority of the class action to available alternatives.

The Securities and Exchange Commission has recognized the efficiency of class actions as a means of resolving claims involving numerous investors, and accordingly approved a rule displacing individual arbitrations in favor of class actions:

> The Commission agrees ... that, in all cases, class actions are better handled by the courts and that investors should have access to the courts to resolve class actions efficiently.... Over the years of the evolution of class action litigation, the courts have developed the procedures and expertise for managing class actions.

S.E.C. Release No. 34–31371, 57 Fed.Reg. 53659 (November 4, 1992).

If the instant motion for class certification were denied, each individual investor would have to arbitrate the existence, and economic effect, of a massive antitrust conspiracy in proceedings that ordinarily provide only limited discovery. *See* NASD Rules of Fair Practice, Art. III § 21(f) (requiring NASD member organizations to warn customers who enter into arbitration agreements that "pre-arbitration discovery is generally more limited than and different from court proceedings.").

Moreover, the conspiracy would have to be litigated before securities industry panels that have been widely criticized for their lack of antitrust or legal expertise. Perhaps most significantly, as set forth above, few, if any, individual investors would have the financial means and motivation necessary to prove the conspiracy alleged here.

In sum, as this Court held in *Maywalt v. Parker & Parsley Petroleum Co.,* 147 F.R.D. at 57:

> In light of the numerosity of the class members and the fact that the typical claim of an individual class member is too small to justify his personally maintaining a separate action, a class action is most appropriate.

Because class action treatment is superior to any other available method for the "fair" and "efficient" adjudication of this case, the requirements of Rule 23(b)(3) are fully satisfied. If insurmountable management problems were to develop at any point, class certification can be revisited at any time under Fed.R.Civ.P. 23(c)(1).

### Plaintiffs' Discovery Motions

Plaintiffs have moved (i) to lift the stay of discovery imposed by ¶ 24 of Pretrial Order No. 3, and (ii) to compel Defendants to produce, pursuant to Rule 37(a), Fed.R.Civ.P.:

(a) all CID deposition transcripts within defendants' control, and (b) the Settlement Memorandum and any evidentiary materials expressly referenced therein.

### A. The Stay of Discovery Will Be Lifted

The stay of discovery was imposed pursuant to the Pretrial Order pending resolution of the class certification motion. That motion is resolved pursuant to this Opinion, and, accordingly, the stay of discovery will be lifted upon issuance of this Opinion.

### B. Plaintiffs' Motions to Compel Production of CID Discovery

■ Rule 26 of the Federal Rules of Civil Procedure provides that "parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action," without regard to whether the material sought will be admissible at trial, "if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Rule 26(b)(1), Fed.R.Civ.P. As the Supreme Court stated in *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978), " 'relevant to the subject matter involved in the pending action'—has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Id.* at 351, 98 S.Ct. at 2389.

As this Court has already held in connection with Plaintiffs' prior motion for discovery of CID materials, those CID materials are relevant and not privileged. *See NASDAQ IV*, 929 F.Supp. 723. The Supreme Court has held that although the relevancy requirement of Rule 26(b)(1) "should be firmly applied," *Herbert v. Lando*, 441 U.S. 153, 177, 99 S.Ct. 1635, 1649, 60 L.Ed.2d 115 (1979), "where the proof is largely in the hands of alleged conspirators," antitrust plaintiffs must be given "ample opportunity" for discovery. *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976); *see, e.g., In re Shopping Carts Antitrust Litig.*, 95 F.R.D. 299 (S.D.N.Y.1982). The CID materials sought here could provide additional evidence regarding liability and damages and potential impeachment material and lead to the discovery of other admissible evidence. *See NASDAQ IV.*

Moreover, the CID materials are not privileged. This Court has adopted the reasoning of the cases that have held in favor of compelling the production of CID materials where such materials are within Defendants' control. *See NASDAQ IV* (citing *In re Domestic Air Transp. Antitrust Litig.*, 142 F.R.D. 354 (N.D.Ga.1992); *In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 556 (N.D.Ga.1992); *In re Air Passenger Computer Reservation Sys. Antitrust Litig.*, 116 F.R.D. 390 (C.D.Cal.1986)).

■ Defendants urge that the CID materials sought by Plaintiffs are not within the Defendants "possession, custody, or control," and therefore Defendants are not required to produce them pursuant to Rule 34, Fed. R.Civ.P. However, under Rule 34, "a party need not have actual possession of documents to be deemed in control of them." *In re Folding Carton Antitrust Litigation*, 76 F.R.D. 420, 423 (N.D.Ill.1977). A "party has 'control' over a document if that party has a legal right to obtain those documents." *Haseotes v. Abacab International Computers, Inc.*, 120 F.R.D. 12, 15 (D.Mass.1988). *See also Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir.1984) ("Control is defined not only as possession, but as the legal right to obtain the documents requested upon demand"). Courts have also "interpreted Rule 34 to require production if the party has the practical ability to obtain the documents from another, irrespective of his legal entitlement." *Golden Trade S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 (S.D.N.Y.1992). *Accord, e.g., Scott v. Arex, Inc.*, 124 F.R.D. 39, 41 (D.Conn.1989) ("A party controls documents that it has the right, authority, or ability to obtain upon demand").

### 1. Defendants Will Be Compelled to Produce the CID Transcripts

Those CID deposition transcripts already in Defendants' possession must be produced. As set forth above, discovery of those transcripts was stayed pending resolution of the

class certification motion, and that motion is resolved pursuant to this Opinion. Accordingly, no reason presently exists to further delay production of those transcripts currently in Defendants' possession.

With respect to Defendants' employees' deposition transcripts not in Defendants' possession, those employees are entitled by law to copies of their CID deposition transcripts. *See* 15 U.S.C. § 1312(i)(6). Moreover, to the extent Defendants exercise control over their current and former employees, Defendants will produce transcripts of those employees' depositions. *See In re Woolworth Corporation Securities Class Action Litigation*, 166 F.R.D. 311, 313 (S.D.N.Y.1996); *In re Domestic Air*, 142 F.R.D. 354, 357 n. 4 (N.D.Ga. 1992); *In re Folding Carton*, 76 F.R.D. at 423.[23]

A current or former employee may be considered under a Defendants' control for Rule 34 purposes where that employee was: (i) briefed by a company representative or counsel prior to the CID deposition or debriefed after the deposition; (ii) represented by counsel recommended, retained, or paid for by a company representative or counsel; or (iii) informed by a representative of defendant or defense counsel of the possibility of ordering a copy of their CID transcript. *See In re Domestic Air*, 142 F.R.D. at 357. *See also Herbst v. Able*, 63 F.R.D. 135, 138 (S.D.N.Y.1972) ("Plaintiffs ... may request [Defendant] to have its non-defendant employees procure copies of their private testimony before the SEC so that [Defendant] may give same to plaintiffs. Plainly [Defendant's] employees are persons within its control").

Accordingly, each Defendant will be required to identify those of its current employees or former employees who were deposed by the DOJ in connection with the Nasdaq investigation,[24] and to produce to Plaintiffs, at Plaintiffs' expense, transcripts of the depositions of those current and former employees under Defendants' control as defined herein.

### 2. *Defendants Will Not Be Compelled to Produce the Settlement Memorandum*

■ Defendants contend that they cannot produce the Settlement Memorandum, as it is not in their possession, custody or control as required under Rule 34. Plaintiffs contend that Defendants can be compelled to produce the Settlement Memorandum, because they have the legal right to obtain it— and all of the CID evidence collected by the government—pursuant to Fed.R.Civ.P. 26 and 34 and DOJ regulations set forth in the Antitrust Division Manual. Pursuant to those regulations, "[i]f a civil action is commenced based on information obtained by CID, the defendants in that action may invoke their full discovery rights under the Federal Rules of Civil Procedure and obtain CID information relevant to their defense." *See* Antitrust Division, U.S. Department of Justice, Antitrust Division Manual at III–46.

The plain language quoted above, however, indicates that this regulation was intended to afford Defendants in government antitrust actions a full and fair opportunity to defend against such actions. To hold that such language can be invoked to allow Plaintiffs to obtain discovery of CID materials for use against Defendants in a private action would distort the regulations and impose an injustice on Defendants.[25] No case support exists

---

**23.** Defendants cite *In re Air Passenger Computer Reservation Systems Antitrust Litigation*, 116 F.R.D. 390, 393 (C.D.Cal.1986), in support of their position that a witness might be able to avoid discoverability of his CID deposition testimony by simply refusing to request a copy of it. 116 F.R.D. at 393. The *dictum* upon which Defendants rely has been superseded by statute. *See In re Woolworth Corp. Securities Class Action Litigation*, 166 F.R.D. 311, 313 (S.D.N.Y.1996) (*dictum* in *Air Passenger* pre-dates the 1991 Amendments to the Federal Rules of Civil Procedure, and rejected by *Woolworth* court).

**24.** To the extent Defendants have already provided, pursuant to the Pretrial Order, lists of employees deposed by the DOJ, Defendants will be required to update those lists.

**25.** Moreover, pursuant to 15 U.S.C. § 1313(c)(3), the Government may not disclose materials obtained through CIDs without the target's consent. If Plaintiffs here were allowed to obtain all CID materials by forcing Defendants to invoke their general right to discovery of the DOJ's evidence against them, Defendants would be effectively denied the protection intended by § 1313(c)(3).

for the proposition that, pursuant to the regulation cited, Plaintiffs may obtain Government evidence against Defendants even where Defendants do not want to obtain such evidence for use in their own defense. Accordingly, Defendants will not be compelled to obtain from the Government and produce to the Plaintiffs the Settlement Memorandum.

### Conclusion

For the foregoing reasons, Plaintiffs' motion for class certification pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure is hereby granted in part, as set forth above. Plaintiffs motion to compel discovery is hereby granted in part and denied in part as set forth above.

Settle order on notice.

It is so ordered.